(No. 53726.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. ROBERT KUBAT, Appellant.

*Opinion filed January 24, 1983. —Rehearing denied April 8, 1983.*

438

CLARK, J., concurring in part and dissenting in part.
GOLDENHERSH and SIMON, JJ., dissenting.

Daniel D. Yuhas, Deputy Defender, and Gary R. Peterson and Charles M. Schiedel, Assistant Defenders, of the Office of the State Appellate Defender, of Springfield, for appellant.

Tyrone C. Fahner, Attorney General, of Springfield (Michael B. Weinstein, Darrell Panethiere, Neal B. Goodfriend, and David Bindi, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE UNDERWOOD delivered the opinion of the court:

The defendant, Robert Kubat, was indicted by a Lake County grand jury for the aggravated kidnaping and murder on November 2, 1979, of Lydia Hyde. Prior to trial, the State announced its intention to seek the death penalty, and after an extensive *voir dire* examination, a jury was empaneled. Following a five-day trial, the jury found defendant guilty of both offenses. At the subsequent two-stage sentencing proceeding, the same jury found the existence of statutory aggravating factors and determined that there were no mitigating factors sufficient to preclude the imposition of the death sentence. The trial court accordingly sentenced defendant to death for the murder and to an extended term of 30 years' imprisonment for the aggravated kidnaping. Defendant appeals directly to this court pursuant to article VI, section 4(b), of the 1970 Constitution and our Rule 603 (73 Ill. 2d R. 603).

Defendant alleges numerous grounds for reversal of his convictions and sentences, the first of which is that he was not proved guilty beyond a reasonable doubt. A review of the substantial evidence produced by the State, however, leaves no doubt of defendant's guilt of those offenses.

The body of the 63-year-old victim, Lydia Hyde, was found in the early afternoon of November 2, 1979, alongside a highway in Lake County, approximately one mile from the Wisconsin State line. Mrs. Hyde had been shot in the head at close range.

The chief prosecution witness was Carolyn Sue Quick, age 41, the former wife of defendant and an admitted participant in the abduction of Mrs. Hyde. The State's Attorney of Lake County had agreed to dismiss the aggravated kidnaping charges pending against her in exchange for her testimony.

Quick had been married to defendant twice; they had no children. She was also divorced from her first husband, Gwen Quick, with whom she had three children. Her marriage to defendant in June 1976 ended in a divorce in September 1977. She and defendant remarried in late August 1979, while she was hospitalized for an operation. She testified that she had only a partial recollection of this marriage ceremony, which she said was arranged by defendant without any prior agreement between the two. She and defendant had continued to see each other, however, following their divorce and lived together not infrequently until they remarried. Prior to her second marriage to defendant, Quick had also lived with Larry (Ray) Flatoff for approximately one month at his trailer-house in South Bend, Indiana. She left Flatoff's residence in August 1979 to enter the hospital and returned with defendant, her two adult sons and a son's girlfriend on September 7, 1979, to retrieve her clothing. She testified that defendant removed Flatoff's .38-caliber revolver and holster on that date, and she and defendant returned to Lyons, Illinois, where she had been living with defendant following their marriage and her hospital stay. Also living with defendant and Quick at that time was Francine Bejda, with whom, Quick testified, defendant was sleeping, while Quick slept on the floor. Apparently unhappy with that arrangement, Quick left in mid-September and returned to Flatoff's residence in South Bend. At about that time, she consulted her attorney regarding an annulment. She subsequently moved to her father's house in West Frankfort, Illinois. During the course of Quick's testimony, she indicated that defendant's height was approximately 5 feet 11 inches, he weighed 150 pounds, and he had an indented or cleft chin, which she pointed out before the jury. She stated that Flatoff did not have a cleft chin.

Quick's testimony concerning the events which pre-

ceded and followed the death of Lydia Hyde was as follows: On October 27, 1979, Quick left her father's house and drove to Des Moines, Iowa, to meet defendant. Defendant was employed as a truck driver at the time and was scheduled to drive to Sparks, Nevada, in connection with his work. Quick accompanied defendant and his co-worker, Paul Kacelak, on the trip in a truck which was equipped with sleeping accommodations. The three returned to Des Moines in the early morning of November 1, at which time Quick retrieved her car and followed the two men back to Chicago. Quick went to the residence of Emily Gabriel, defendant's sister, in Tinley Park. She stayed there until approximately 10:30 or 11 p.m. that night, when she left to meet defendant at Jeannie's Lounge. She was driving her 1978 Buick; defendant was driving his white 1977 Chevrolet station wagon. The two happened to meet at an intersection on the way to the lounge, and changed plans with Quick following defendant to the Nugget in Berwyn, where they had a couple of drinks and stayed until closing time, approximately 12:50 a.m. Their next stop was Ed's Grill. They left Ed's Grill in defendant's station wagon and proceeded to Kenosha, Wisconsin. Quick left her car in front of Ed's Grill.

During the early morning hours of November 2, 1979, defendant and Quick stopped at the Kickapoo gas station in Kenosha, where they parked and napped until the station opened. When they awoke, defendant folded a blanket and stacked a pillow, put gas in the car, and went to the washroom, and the two proceeded to the Chat and Chew restaurant. Quick went inside the restaurant alone, had a bowl of oatmeal, and ordered two coffees to go. The pair continued to drive through Kenosha until they reached the Back Door restaurant and bar. They left the Back Door after being informed by an employee that the restaurant was closed. They then went to the

Sunnyside restaurant and bar, where Quick drank a can of grapefruit juice and defendant an Old Style beer and a shot of Canadian Club (CC). After staying at the Sunnyside for approximately 45 minutes, they returned to the Back Door, which was then open. Defendant was wearing a "rusty brown" hat (which Quick identified as People's exhibit No. 58) and a gray coat with a black collar. It was shortly after 11 a.m.

The couple sat at the bar in the Back Door, and defendant engaged in a lengthy conversation with Jesse Lopez, who owned the bar with his wife, Nora. Mrs. Lopez was also present. Defendant drank an Old Style beer and a shot of CC; Quick had a soda, and the two shared a sandwich. Quick commented about the owner's "beautiful gray hair," and an employee, Sandra Lawson, who had previously informed defendant and Quick that the restaurant was closed, jokingly responded with the words to the effect that "it ought to be pretty, he combs it all the time." As it approached the noon hour, Sandra Lawson asked the couple whether they would be staying for lunch. Defendant responded that they would be leaving shortly.

After leaving the Back Door, defendant and Quick drove to the Coffee And bar, where Lydia Hyde was alone, bartending. Defendant sat at the bar directly in front of the cash register; Quick sat to his left. Defendant drank an Old Style beer and a shot of CC; Quick drank a glass of grapefruit juice. While the two sat at the bar, a man came down from upstairs, mixed two drinks and left with the drinks. Shortly thereafter, a woman came down and also mixed two drinks and left. After Mrs. Hyde placed a money bag in the cash register, defendant went behind the bar, held a .38-caliber revolver to her back, and told her to put the money from the register in the bag. She complied. At defendant's direction, Quick emptied the beer can and glasses on the

bar and floor and placed them in her purse. Defendant told Mrs. Hyde that "she was going with (them)." She asked and was allowed to get her coat. Mrs. Hyde was taken to the car where she sat in the front seat between Quick, who was driving, and defendant. Quick drove at defendant's direction until she saw a sign that read "41 to the left, Illinois tollway straight ahead," at which point defendant told her to pull over. Mrs. Hyde held Quick's hand while defendant displayed the gun. After stopping the car next to the sign, defendant ordered Mrs. Hyde out of the car and told her to hold the sign and face west. As Mrs. Hyde held her hands up to hold the sign, defendant, who was standing just beside her, told her "she wouldn't feel a thing" and shot her in the back of the head. Mrs. Hyde fell to the ground at defendant's feet, fatally wounded. Defendant got back into the car, and Quick drove on to the Illinois Tollway.

The next stop defendant and Quick made was in Stickney, Illinois, at Valentine's restaurant. Defendant ordered lunch and an Old Style beer with a shot of CC. They left Valentine's and went to the M & D lounge in Berwyn, where they saw Michael and Delores Padgen and their son, Thomas, with whom they were acquainted. Mr. and Mrs. Padgen gave defendant and Quick paper towels that defendant had ordered about three weeks previously. Defendant drank an Old Style beer and a shot of CC. He had a conversation with the Padgens about a play that he and Quick had tickets to see that evening at the Candlelight Theater. Quick handed Thomas, who was bartending, the three glasses she had taken from the Coffee And bar which she told him to keep, although he had indicated that the glasses were not from M & D's. Defendant and Quick later picked up Quick's car at Ed's Grill and went to the Brookfield Motel. Defendant cancelled their theater reservations and placed a call to his brother, Richard, and

Francine Bejda.

Defendant left the motel the following morning about 7 a.m.; Quick left about 11 a.m. and drove to Joy Jesuit's house in Chicago, where she stayed for a couple of weeks. While staying there, Quick saw defendant every day at Joy Jesuit's tavern. On November 9 or 10, Quick accompanied defendant to the Goodyear Tire store, where defendant bought a new set of tires for his car. She stated that the tires were in good condition, although defendant had had trouble with the rims on two or three occasions.

Quick left Jesuit's residence on November 19 and drove to Flatoff's trailer-house in South Bend. She told Flatoff about the kidnaping and murder of Mrs. Hyde, and the two went to see an attorney, Edward Olczak, who advised Quick to talk to the FBI. She subsequently met with agents of the FBI and the Illinois Department of Law Enforcement on November 23 and 24, and gave written statements.

On November 27, Quick appeared in court, testified that her second marriage to defendant was never consummated, and received an annulment. She was arrested the following day, waived extradition, and was taken to the Lake County jail. She testified at defendant's trial while still in custody.

On cross-examination, Quick was repeatedly questioned concerning her sleeping arrangements and sexual intimacy with defendant following their marriage in August 1979. She stated that she did not sleep with defendant when they lived together with Francine Bejda in Lyons, Illinois. After persistent cross-examination by defense counsel in an attempt to establish that she had lied under oath in the annulment proceeding, Quick equivocated, conceding the possibility that she and defendant might have had sex on the night they spent at a motel in Wyoming on the return trip from Nevada.

Quick also testified that she had contacted the FBI and the police in July 1979, and again in October 1979, to report that defendant was stealing. In October, she reported that defendant had stolen Flatoff's guns. She indicated that the FBI gave her the "runaround."

It was further established that, in July 1979, Quick displayed a .38-caliber revolver to defendant's neighbors' son, and handed the boy a bullet which he was instructed to give to defendant with a message. She testified that the boy was to tell defendant that "it [the bullet] had five more sisters if he found [Quick]." She was asked whether the message was intended as a threat to kill defendant, and she replied, "you can put it any way you want; *** only if he bothered me."

Quick's testimony concerning the events from October 27 to November 3 was corroborated by a number of witnesses, some of whom were able to positively identify defendant as her companion. Paul Kacelak, defendant's co-worker on the trip to Nevada, testified that he, defendant and defendant's girlfriend or former wife made the trip to Nevada on October 27. He stated that they returned to Des Moines, Iowa, on November 1, at which time they dropped off Quick, who picked up her car. They returned to Chicago about noontime.

Emily Gabriel, defendant's sister, testified that Quick was at her home in either October or November, arriving at approximately 2 in the afternoon. She testified that Quick left at approximately 10 or 10:30 p.m. that evening.

Rhonda Meeker operated the Kickapoo self-service gas station in October and November, 1979. She testified that, in late October or early November, she opened the station at 6 a.m. and observed a couple parked in the parking area in a white station wagon. At approximately 7:30 or 8 a.m. that morning, the couple "straightened up beddings, folded a blanket," and pulled up to the pumps.

She stated that the man went to the washroom, the woman paid for the gas, and the couple drove away.

Mary Sands was employed as a waitress at the Chat and Chew restaurant in Kenosha on the morning of November 2. She testified that a woman came into the restaurant on that date, alone, between 8 a.m. and 9 a.m. She served her a bowl of oatmeal and two coffees to go. She had never seen the woman before, but testified that she again saw her that morning in the State's Attorney's office, shortly before the witness testified.

Nick Bastian had been a bartender at the Sunnyside bar for over 20 years. He testified that a man and a woman came into the bar at approximately 8 a.m. on November 2. He served the woman grapefruit juice and the man a bottle of Old Style beer and a shot of CC. He stated that the man's order was not a usual order because most of the shot and beer drinkers drank the bar liquor. The couple stayed between a half hour and 45 minutes. He testified that he subsequently identified the woman.

Jesse Lopez identified defendant as the man who was in the Back Door bar the morning of November 2. Mr. Lopez testified that the Back Door was a neighborhood bar frequented by few strangers; 98% of his business came from the American Motors plant in the area. Mr. Lopez testified that defendant and a woman came into the bar shortly after it opened at 11 a.m. Defendant drank an Old Style beer and two shots of CC, and he and the woman shared a sandwich. Mr. Lopez was checking his receipts from the previous evening and counting rolls of change that were already wrapped. He spoke to defendant for 20 to 25 minutes at a distance of 3½ to 4 feet. He recalled that the woman made a nice comment about his hair, and that Sandra Lawson responded that he would have a "big head the rest of the day." He remembered that defendant was wearing a cap,

and that he had a "dimple" or cleft in the middle of his chin, which reminded Mr. Lopez of a movie star who had a similar feature. Mr. Lopez positively identified defendant in court and pointed out the "dimple" or cleft at the bottom of defendant's chin.

Mr. Lopez also testified that he had previously identified a photograph of defendant on two separate occasions. On cross-examination, it was established that he had previously made a written statement in which he stated, "[S]ome days later officers showed me some pictures. I picked out a picture of the female right away. I was pretty sure of the picture of the male."

Sandra Lawson testified that she was working at the Back Door bar on November 2. She identified defendant as a man who looked like the man who was in the bar with a woman between 11 a.m. and noontime. She also testified that she had seen the couple before the bar opened and told them that they would be opening at 11 a.m. The witness was preparing for the noon-lunch-hour crowd while the couple sat at the bar. She, too, testified that the patrons of the bar were regular customers, most of whom she knew on a first-name basis. She also testified to the conversation concerning Mr. Lopez' hair, and stated that she had asked the couple whether they would be staying for lunch inasmuch as they were seated in a reserved spot. Defendant and the woman, whom she said she had seen again on January 3, 1980, with the assistant State's Attorney and several lawyers and detectives, left the bar just before noon.

Nora Lopez identified defendant as the man who was in the Back Door bar on the morning of November 2. It was her testimony that the couple, whom she had never seen before, stayed between 40 and 50 minutes, and that she served them a sandwich. Mrs. Lopez was preparing food for the lunch-hour crowd and did not engage in a conversation with the couple. She also testified that she

had identified a photograph of defendant in February 1980. On cross-examination, Mrs. Lopez indicated that she had signed a statement on January 14, 1980, in which she stated that the "police came with pictures of males and females. I recognized a picture of the female who was in the bar, *** but not the male."

Dale Gonsky worked at the Coffee And bar and restaurant and lived upstairs with Julie Lewis, the owner of the bar. He testified that, at approximately 12:30 p.m., on November 2, 1979, he went down to the bar to get two drinks for Julie Lewis and Dorothy Hawley, a friend, who was also staying at the apartment at the time. Lydia Hyde was bartending, and a man and woman were seated at the bar. He stayed a couple of minutes and returned upstairs with the drinks. He subsequently returned to the bar, saw that Mrs. Hyde and the couple were gone and that there was "water or something on the floor." He indicated on cross-examination that he told the investigating police officers that the woman seated at the bar had given him "an icy stare," and that he told the officers that he had seen a gray car pulling away from the parking lot.

Dorothy Hawley testified that she spent the night in the apartment above the Coffee And on November 1. She was employed as a truck driver and had driven in from North Carolina. On November 2, at approximately 12:30 p.m., she also went down to the bar, observed a man and a woman at the bar "who were staring at her," and took two 7-Ups back upstairs. She subsequently returned to the bar to use the bathroom, and saw that Mrs. Hyde and the couple were gone. Mrs. Hyde's sweater was thrown over the coffee pot, the money from the cash register was gone, there were no glasses on the bar, and a drink was spilled. The police were called. Mrs. Hawley, who was acquainted with Ray Flatoff, testified that she had never before seen the man or woman who

were at the bar that morning.

On cross-examination, Mrs. Hawley testified that, on November 2, she had attempted to describe the man at the bar to the police. She thought he weighed approximately 190 pounds. She also stated that she had initially described the car that she had seen rapidly pulling away from the bar as yellowish or white, but that Dale (Gonsky) thought it was gray, and that she, too, then indicated that it was probably gray. On redirect examination, she testified that in her description to the police, at which she guessed, she had also indicated that the man was approximately 50 years old and 5 feet 10 inches tall.

Julie Lewis testified that Mrs. Hyde, who had been employed as her bartender for approximately seven years, opened the bar at 10 a.m. on the morning of November 2. Mrs. Lewis was in the apartment upstairs with Dale Gonsky and Dorothy Hawley. She testified that she was ill that day and that both Dale Gonsky and Dorothy Hawley went downstairs to the bar, at separate times, sometime after 12:30 p.m., and returned a couple of minutes later with glasses of 7-Up. Mrs. Hawley informed her that a man and a woman were seated at the bar, and that they glared at her. Julie Lewis immediately dressed and went downstairs. No one was in the bar. She searched for Mrs. Hyde, to no avail, but she did discover that Mrs. Hyde's purse was in the cupboard, her sweater was thrown over the coffee pot, there were drinks spilled on the bar, and there was no money in the cash register. She told Mrs. Hawley to call the police.

On direct examination, Julie Lewis identified a glass, People's exhibit No. 10, as similar to the type of glasses she had used in the bar. The same exhibit had previously been identified by Quick as the type of glass she had taken from the Coffee And. On cross-examination, Julie Lewis testified that she had used seven different types of standard unmarked bar glasses that she bought from

a wholesale store.

Delores Padgen, who owned M & D's bar with her husband, Michael, testified that defendant and his wife, "Pat or Carol," came into her bar at 3 or 3:30 p.m. on November 2. They stayed one hour to one hour and one-half. Mrs. Padgen had known defendant for approximately three years, and identified him in court. She testified that defendant drank an Old Style beer and a shot of CC, which she knew to be his usual drink. She recalled that the couple told her that they had just returned from "Vegas" and that they had been in Wisconsin that day. Defendant indicated that he would be going on another trip to Vegas, but that he was not planning on leaving until Monday. Either defendant or Quick also stated that they had tickets to go to the Candlelight theater that evening. Mrs. Padgen testified that her husband gave defendant a case of paper towels that had previously been ordered, for which defendant paid $23 in cash.

On cross-examination, Mrs. Padgen testified that she had ordered the paper towels for defendant three weeks before he picked them up. She was certain that the date the couple picked up the towels was November 2. She conceded that she had previously told defense counsel that defendant was late in picking up the towels; she indicated, however, that it normally took only a few days for such an order to be delivered.

Michael Padgen testified that he had seen "Bob" on four or five occasions over a three-year period. It was his testimony that "Sue and Bob" picked up paper towels sometime in November—"November 2nd, something like that." He was unable to identify defendant as being in the courtroom.

After Mr. Padgen's testimony, the State sought to recall him to determine whether, subsequent to his testimony, he saw defendant in the courtroom. Defense coun-

sel's "strenuous objection" was sustained. Later, in an in-chambers conference, the assistant State's Attorney asked the court to reconsider its previous ruling, indicating that he thought Mr. Padgen never looked at defense counsel's table and made an honest mistake. Defense counsel objected. The court was of the opinion that Mr. Padgen looked at defense counsel's table and appeared to wink with his right eye, either consciously or subconsciously. The court ruled that, in any event, Mr. Padgen had had an opportunity to identify defendant, and the State would not be permitted to recall him.

Thomas Padgen testified that defendant, whom he identified in court, was in M & D's bar on November 2 while Thomas was bartending. He testified that defendant arrived between 3:30 and 4 p.m. with a woman, whom Thomas believed was "Carol." The couple stayed in the bar approximately one hour and a half, during the course of which the woman gave Thomas three glasses which she told him she was returning. Thomas told her that they were not from M & D's, as they were shaped differently from the glasses he used. Two of the glasses were later broken; the remaining glass was given to a police officer (who later identified it as being People's exhibit No. 10). Thomas identified People's exhibit No. 10 as the glass that the woman had given him.

On cross-examination, Thomas testified that there were 12 or 14 people in the bar on November 2 and that defendant was seated at one of the two tables about 15 feet from the bar. When asked how he remembered the date, he replied that the only reason he remembered was because it was Friday, one of his busiest afternoons.

Vashanti Parikh worked at the Brookfield Motel on November 2. She testified that she had rented a room to a woman on that date and identified a registration card. Mrs. Parikh stated that she had seen the woman on the day of her testimony in the State's Attorney's office.

Joy Jesuit was called as a witness by both sides. She had known both defendant and Quick for several years. On behalf of the State, she testified that Quick called her the morning of November 3 and asked if she could stay with the witness for a week or two. Quick stayed approximately two weeks, leaving on a Monday or Tuesday. During that period, Quick and defendant saw each other every day in Joy Jesuit's bar.

George Kautz, an employee of Goodyear Tire and Rubber Company, testified that defendant, whom he identified in court, purchased five new tires and two wheels on November 10, 1979. The tires on defendant's car, which were inflated, were removed and returned to defendant. The transaction was charged on defendant's American Express card; a copy of the receipt was identified by the witness. The invoice from the store, which identified the witness as the salesman, and the charge card receipt were admitted in evidence.

Detective Wayne Myhre of the Kenosha County sheriff's department testified that he interviewed Mr. and Mrs. Lopez separately at the Back Door bar on November 26, 1979. After viewing a color photographic display, Mr. Lopez identified the photograph of defendant, stating that it looked like the person who was in the bar on November 2. Mrs. Lopez subsequently viewed the display and also identified defendant, stating that she was as positive as she could be that he was the male of the couple that was in the bar on November 2.

Detective Roger Douma of the Kenosha County sheriff's department testified that he also interviewed Mr. and Mrs. Lopez as well as Sandra Lawon at the Back Door bar. He initially met with Mr. Lopez on November 29, 1979. He showed Mr. Lopez a photographic display consisting of seven black and white photographs of different men. Mr. Lopez identified the photograph of defendant. Detective Douma subsequently met with Mrs.

Lopez and Sandra Lawson at the Back Door bar on February 26, 1980. These witnesses viewed a different black and white photographic display at separate times. Mrs. Lopez positively identified the photograph of defendant. Sandra Lawson identified the photograph of defendant, but then indicated that she was not certain whether he looked familiar because of a picture she had seen of him in the newspaper.

Ray Flatoff, a truck driver, also testified on behalf of the State. He drove a pickup truck and did not own an automobile He was 33 years old, 5 feet 11 inches tall, and weighed approximately 170 pounds. The record indicates that he does not have a cleft chin, and the jury was able to so observe. He was acquainted with Dorothy Hawley.

Mr. Flatoff testified that he met Quick in July 1979 and they lived together thereafter for approximately one month in South Bend, until she entered the hospital. He further testified that he had contacted the police in South Bend on September 7, 1979, and told them that Quick had removed her clothes from his trailer-house, and that a .38-caliber handgun and a .22 automatic rifle were missing. He had previously spoken to Quick by telephone, and stated that she denied taking the guns. He subsequently saw her on or about November 19, when she came to his home. Quick told him "what [had] happened," and they went to see a lawyer. Later they met with the FBI.

Edward Olczak, Quick's attorney, testified that Quick had contacted him on September 25 or 26, 1979, and that he filed an action for an annulment on her behalf on September 27. The marriage was annulled on November 27, the complaint stating that "the contract of marriage was obtained through fraud and duress all at a time when said plaintiff was a patient in a hospital and under sedation."

Mr. Olczak further testified that Quick again contacted him on November 21, 1979, and on November 23 he contacted the FBI. He and his client and Ray Flatoff subsequently met with agents of the FBI, and on November 24 they met with several agents of the Illinois Department of Law Enforcement. Mr. Olczak stated that, during the course of these meetings, he had not obtained any promises or engaged in any plea negotiations on behalf of his client.

Agent David Hamm of the Illinois Department of Law Enforcement testified that he was present at the late November motel conference in South Bend with Quick, her attorney, Flatoff, members of the FBI, agent Marshall of the Illinois Department of Law Enforcement, and Sergeant Douma of the Kenosha County sheriff's department. He stated that no promises were made to Quick prior to the meeting.

On January 3, 1980, while Quick was in custody, she accompanied agent Hamm, agent Marshall, Sergeant Douma, and an assistant State's Attorney to Kenosha and retraced the steps she and defendant had taken on November 1 and 2, 1979. Their first stop was the Kickapoo gas station. They then proceeded to the Chat and Chew restaurant, which was a mile to a mile and a half east of the gas station. Next they drove to the Sunnyside bar, where Nick Bastian was bartending. Mr. Bastian identified Quick as the woman who was in the bar with a man on November 2.

Agent Hamm, further testifying, stated that the group left the Sunnyside bar and continued to drive east, about a half mile, until they reached the Back Door bar. They there conversed with Jesse Lopez, who identified Quick as the woman who was in the bar on November 2 accompanied by a man. They then drove to the Coffee And bar at the outskirts of Kenosha and met with Julie Lewis and Dale Gonsky. Mr. Gonsky identified Quick as

the woman who had been in the bar with a man on November 2 about noontime.

After leaving the Coffee And, they drove North, passed under the Interstate I-294 and proceeded south on a frontage road into Illinois, until they arrived at the scene of the murder. Agent Hamm testified that Quick became nauseated at the scene of the crime, and they returned to the county jail.

An FBI agent, Thomas Dupriest, also testified on behalf of the State. He essentially corroborated Quick's testimony concerning the meetings and the fact that no promises were made to Quick on November 23 and 24.

Inspector Loren Williams, an evidence technician with the Illinois Department of Law Enforcement, testified that he arrived at the scene of the crime at approximately 3:30 p.m. on November 2. He secured evidence, including the victim's clothing, eyeglasses and denture plate, blood samples from her head, fragments from her brain, hair standards, finger and palm prints. He also took photographs and prepared a plaster casting of what appeared to be fresh tire tracks. He subsequently transported the evidence to the crime laboratory in Maywood.

Further evidence produced by the State included the testimony of Michael Podlecki, a forensic scientist. Several hairs found in the front seat of defendant's car were consistent with the known hairs taken from the victim. Several other distinct hairs taken from the car were consistent with defendant's. None were consistent with Quick's hair.

Office Allan Marshall of the Illinois Department of Law Enforcement was one of the officers who arrested defendant on November 24, 1979, at defendant's residence in Lyons, Illinois. Officer Marshall testified that Francine Bejda was also present in defendant's home at the time of the arrest. After defendant was advised of his rights and transported to the Lake County jail, he agreed to answer a few

questions. In response to the officers' questions, defendant stated that he was in Lyons, Illinois, on November 1, 1979, with Francine Bejda and that he was also with her on the following day. He further stated that he had never been in Wisconsin.

The State's other witnesses included the officers and investigators who found Mrs. Hyde's body, the physician who performed the autopsy, and the victim's daughter. Their testimony need not be restated here.

Defendant did not testify on his own behalf; however, several witnesses were called in an attempt to establish an alibi and to impeach some of the State's witnesses. Nancy Foster Schultz, a caseworker for the General Assistance Department of the township of Lyons was the first witness called by the defense.

Mrs. Schultz testified that Francine Bejda applied for rent assistance on October 2, 1979. The witness' records indicated that she subsequently met with the applicant on October 29. To the best of her recollection, she again saw her three or four days later on November 1 or 2. A photocopy of a rent check, dated November 2, 1979, payable to defendant, who was Francine Bejda's landlord, was admitted in evidence as defendant's exhibit No. 9(B). That check, drawn on the township of Lyons General Assistance Fund, indicated that it was for October and November 1979 rent. It was signed by Ann B. Painter and Art Schlaman; Mrs. Schultz had typed the check. Mrs. Schultz testified that her records indicated that the check was not mailed. According to Mrs. Schultz' testimony, when Francine Bejda came to the office, she was accompanied by a "man with a hat and glasses, about 5 feet 11, not particularly big, not particularly small," who stood in the hall. Mrs. Schultz identified People's exhibit No. 58 as similar in style to the hat the man wore.

On cross-examination, Mrs. Schultz testified that there

was nothing in her records which indicated the date that the check was delivered. Their regular office hours ended at 4:30 p.m., and they were closed on the weekend. She further stated that the check could not have been issued on Friday, November 2, 1979, if Ann Painter, one of the signatories, had not been in the office on that day. Mrs. Schultz had no recollection of whether Mrs. Painter was in the office on November 2.

Lillian Tesnohlidek, who owned the Star Club bar in Chicago, also testified on defendant's behalf. She had known defendant seven or eight years, although he came to her bar infrequently. She testified that defendant and his wife, Sue, came into her bar between 10:30 and 11 a.m. on November 2, 1979. Also present on that date was a regular customer, Charlie. She identified Quick's photograph as the woman to whom she was referring. She had identified the same photograph previously when the police showed it to her on June 5, 1980. The witness was positive that it was Sue who was with defendant on November 2; however, she stated that Sue had much shorter hair on that date than she did in the photograph. The photograph, in which Quick appeared with long hair, was dated November 28, 1979, and had been taken at the Lake County sheriff's department following her arrest.

The witness further testified that defendant had attempted to cash a check on November 2, 1979, and she identified the check to which she was referring as defendant's exhibit No. 9(B). She did not cash the check.

Mario Brajkovich, the owner of a Chicago bar, also testified on behalf of defendant. He had known defendant for approximately 12 years, and heard about defendant's arrest from a customer named Charlie, about a week after it occurred. The witness testified that Charlie had been to Lil's Tavern (Lillian Tesnohlidek) before he arrived. Mr. Brajkovich also stated that defendant had been in his bar

four weeks prior to that conversation with Charlie, on a Friday, at which time he cashed a check. Defendant's exhibit No. 9(B), which was endorsed by Mr. Brajkovich, was identified by him as the check that he had cashed on that Friday. He further stated that, on the date that defendant cashed the check, which did not appear on the instrument, defendant was accompanied by a woman, not his wife, with dark hair, approximately the same height as defendant.

On cross-examination, Mr. Brajkovick indicated that he had spoken to agent Hamm on June 5, 1980, and told him that defendant had been in his bar four or five weeks before his arrest; he was not exactly sure. He also indicated that he had told the officer that the woman with defendant "looked" to be of Mexican or Italian descent and that she was close to defendant's size or possibly two inches taller. He denied that he had identified defendant in a photograph of defendant's brother, Richard.

The defense also called Joy Jesuit and Mary Cooper for the purpose of impeaching Quick's credibility. Joy Jesuit testified that Quick had told her on August 21, 1979, about her plans to remarry defendant, and showed her a marriage license. Quick had asked if she could have a small reception after the wedding at the witness' bar. The reception never took place, however, because Quick entered the hospital. Joy Jesuit, who had brought a negligee that Quick had requested, was present at the hospital during the ceremony performed by a minister who, she said, had been contacted by Quick. The witness stated that Quick was very happy about the marriage, coherent during the ceremony, and did not appear to be under sedation or medication.

Mary Cooper, testifying for the defense, had known defendant and Quick for several years. She and her husband had seen them quite frequently prior to July 1979.

Mrs. Cooper testified that Quick told her at that time that she was happily married and living in Indiana. A few weeks later, Quick apologized to Mrs. Cooper, explaining that she had lied about being married in the hope that the information would be passed to defendant so that he would be hurt. Mrs. Cooper also stated that she saw Quick a day or two after she was released from the hospital, and she appeared very happy.

The final defense witness was Stephen Martin, a law student, who had previously worked as an investigator with the Lake County public defender's office. Mr. Martin testified that he went to M & D's lounge on January 18, 1980, and met with Mr. and Mrs. Padgen, who told him that defendant and Quick could have picked up the towels on the last Friday in October, November 2 or November 9, 1979.

The State called two witnesses in rebuttal, Ann Painter and agent David Hamm. Mrs. Painter, an elected official of the township of Lyons, was the supervisor of General Assistance. She testified that, on November 2, 1979, she left her home in La Grange at 7 a.m. and drove to Chicago, where she attended a meeting at the American Hospital Association on Lake Shore Drive. It was established that she returned home after 4:30 p.m. While she could not recall whether she stopped at her office when she returned, if she had, the office would have been closed. She testified that the check payable to defendant (defendant's exhibit No. 9(B)), dated November 2, 1979, would not have been signed prior to that date; and since she was not in her office during business hours on that date, the check could not have been delivered then. Further, she indicated that Art Schlaman, the second signatory, would not have signed the check unless her signature appeared.

Agent David Hamm testified that on June 5, 1980, he interviewed Lillian Tesnohlidek and Mario Brajkovich.

Agent Hamm stated that the former told him that she was positive that defendant was with his wife, Carolyn Sue Quick, when he was in her bar the preceding November. She knew Quick and also identified her photograph. Mr. Brajkovich told Officer Hamm that he had last seen defendant five weeks prior to his arrest, sometime in October, and that defendant was accompanied by a woman, not his wife, of either Mexican or Italian descent, approximately two inches taller than defendant. Officer Hamm testified that he was familiar with Francine Bejda, and that she was 5 feet 4 inches tall; he estimated defendant's height at 6 feet 1 inch. He also stated that Mr. Brajkovich identified defendant in a photograph of defendant's brother, Richard.

Defendant argues, citing *People v. Wilson* (1977), 66 Ill. 2d 346, *People v. Williams* (1976), 65 Ill. 2d 258, *People v. Hermens* (1955), 5 Ill. 2d 277, and *People v. LaCoco* (1950), 406 Ill. 303, that the only evidence linking him to the offenses charged was the discredited testimony of an accomplice whose testimony lacked "absolute conviction of truth," was premised upon promises of leniency and was uncorroborated, and that, consequently, he was not proved guilty beyond a reasonable doubt. We cannot agree.

Quick testified in detail concerning the events which transpired on November 1 and 2, 1979. There is no dispute that she was in Wisconsin on November 2, and that she was present when Mrs. Hyde was kidnaped and later murdered in Illinois. Several witnesses in Wisconsin and Illinois positively identified defendant as her companion on that day. Further, the State's witnesses corroborated details related by Quick, including conversations, times, the couple's actions and drinking pattern. The defendant's "alibi" evidence, which was contradictory and unpersuasive in any event, was refuted by Mr. and Mrs. Lopez, who placed defendant in Wisconsin with Quick, and by Delores and

Thomas Padgen whose testimony sufficiently established that defendant was with Quick, not Francine Bejda, in M & D's lounge on the afternoon of November 2, 1979. It was the jury's responsibility to resolve contradictory evidence and factual disputes and weigh the credibility of the witnesses. *People v. Lewis* (1981), 88 Ill. 2d 129, 151-53; *People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Clark* (1972), 52 Ill. 2d 374, 387. In our judgment, the testimony as well as the physical evidence overwhelmingly supports the verdicts of guilty, and we must accordingly reject defendant's contention that a reasonable doubt as to his guilt exists.

Defendant next argues that the photographic identification procedures utilized by police were unnecessary and improper and so "impermissibly suggestive and conductive to misidentification" as to deny defendant due process of law. Following an extensive two-day hearing, defendant's motion to suppress the identification testimony of Mr. and Mrs. Lopez and Sandra Lawson was denied; the court granted the motion with respect to the identification testimony of Nick Bastian.

Detective Wayne Myhre testified that he went to the Back Door bar on November 26, 1979, while investigating the murder of Lydia Hyde. He interviewed Mr. and Mrs. Lopez and Sandra Lawson and showed each potential witness a photographic display to determine whether they could identify people who were in the bar the morning of the preceding November 2. Each individual was interviewed separately and shown the display without any other person in the immediate vicinity. The display consisted of five color Polaroid photographs of identical size. (People's exhibit No. 2). Each photograph had a different color background; four were close-ups depicting a man standing against a solid wall ranging from a facial view to a nearly full chest view; the photograph of defendant was some-

what unclear, not a close-up, and depicted a full frontal view with defendant standing in a living room next to a television and a couch, with a picture hanging on a wall in the background. Defendant was the only man wearing glasses.

Detective Myhre testified that Jesse Lopez, who looked at the photographs one at a time, stated that the photograph which pictured defendant looked like the male of the couple that was in his tavern on November 2, 1979. The officer also testified that Nora Lopez identified that photograph of defendant, stating that "she was as sure as she could be" that he was the man who was in the bar, although he agreed on cross-examination that she did not say she was absolutely certain.

Finally, the officer interviewed Sandra Lawson, who made a tentative identification of defendant's photograph. She stated that the photograph of defendant appeared to be the man.

Sergeant Roger Douma, also investigating the murder, went to the Back Door bar on November 29 and interviewed Jesse Lopez. It was his recollection that he and Mr. Lopez were the only two people present. Sergeant Douma was aware of the fact that Mr. Lopez had previously viewed photographs. Sergeant Douma showed Mr. Lopez seven black and white photographs of different men; all were mug shots. (People's exhibit No. 4.) One individual was pictured with eyeglasses; defendant was not. Mr. Lopez identified defendant.

On February 26, 1980, Sergeant Douma again went to the Back Door bar, where he showed another photographic display to Sandra Lawson and Nora Lopez. He interviewed Sandra Lawson first at the north end of the bar; Nora Lopez was at the south end of the bar during this interview. Sergeant Douma asked Sandra Lawson to carefully view the photographic display (People's group exhibit No. 3)

consisting of seven black and white mug-shots of different men, one of whom was pictured wearing eyeglasses while defendant was not. She did so, identifying the photograph of defendant, but then indicated that she was concerned that she might have recognized the photograph because she had seen it in the newspaper.

Sergeant Douma subsequently interviewed Nora Lopez at the extreme north portion of the bar. She, too, identified the photograph of defendant as the man who was in the bar with a woman in early November. Sergeant Douma thereafter wrote on the photograph, "Nora Lopez positively [identified] this photo"; he also initialed the photograph and dated it.

Jesse Lopez, testifying at the hearing, made an in-court identification of defendant. He was positive that defendant was the man in his bar on November 2. It was Mr. Lopez' testimony that he had initially viewed the black and white photographic display. He testified that he had not read a newspaper account of the abduction and murder of Lydia Hyde before the officer initially interviewed him.

Nora Lopez also identified defendant at the hearing as the man who was with a woman at the Back Door bar the morning of November 2. She testified that she was not certain of her initial photographic identification; she could not recall her exact words to the officer.

Sandra Lawson testified at the hearing that a middle-aged couple was in the Back Door bar on the morning of November 2. She pointed to defendant in the courtroom and said, "I think that's him there, but I'm not sure." She further testified that she had viewed two different photographic displays on separate occasions. She could not recall the details of the viewings. She indicated, however, that she initially picked out a photograph and said, "I believe this man was in here with this woman." She recalled that, in February 1980, she had told the officer that she was not

certain whether she was influenced by what she had read and seen in the newspaper.

Defendant argues specifically that (1) the photographic identification procedures were improper because he was in custody, (2) the first array itself, as well as the manner in which it was presented, was inherently suggestive, (3) the subsequent arrays, while not in themselves suggestive, were tainted by the initial viewing, and additionally became suggestive because defendant was the only man whose photograph was common to each of the displays, and (4) an independent origin did not exist to establish separate reliability for the in-court identification.

There is, of course, no constitutional impediment to the use of photographs in the initial identification, despite the recognition that there is a risk of misidentification when the procedures are improperly employed. (*Simmons v. United States* (1968), 390 U.S. 377, 385-86, 19 L. Ed. 2d 1247, 1254, 88 S. Ct. 967, 972.) When properly used, this technique "is indispensable in the investigatory phase of a criminal case." (*People v. Jackson* (1973), 54 Ill. 2d 143, 147.) When a suspect is in custody, however, and a lineup is otherwise feasible, this court has generally disapproved of the use of photographs as a basis of identification, absent extenuating circumstances justifying their use. *People v. Williams* (1975), 60 Ill. 2d 1, 9; *People v. Jackson* (1973), 54 Ill. 2d 143, 147-48; *People v. Holiday* (1970), 47 Ill. 2d 300, 306-07.

The police here were faced with the task of interviewing numerous potential witnesses at a time when they were simply attempting to discover whether any nonoccurrence witnesses existed to corroborate Quick's statement. Indeed, many of the individuals interviewed in Wisconsin, including those who had little opportunity to observe the couple, could not make an identification. There is a vast difference between asking a local resident to view a sta-

tion-house lineup and the situation that existed here, where the police would have had to ask many individuals to travel to Illinois without even knowing whether they could remember seeing a couple earlier that month at their establishment or whether they could make an identification. Thus, we do not believe that the initial photographic identification procedures were improper.

Nor do we believe that the first color photographic array was so "impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification" (*Simmons v. United States* (1968), 390 U.S. 377, 384, 19 L. Ed. 2d 1247, 1253, 88 S. Ct. 967, 971). That the photograph of defendant depicted him wearing eyeglasses and in a different pose from the others is not dispositive. (See *People v. Williams* (1975), 60 Ill. 2d 1, 9-10.) The fact that the photograph of defendant was somewhat unclear seemed to make it the least suited to identification. Moreover, the Lopezes positively identified defendant in the subsequent array in which he was pictured entirely differently and without eyeglasses, which indicates that their initial identification was not based primarily upon the "differences" to which defendant points. Finally, the record establishes that the police made no suggestion to the witnesses that defendant was the suspect or in any way emphasized his photograph. Although the interviews were conducted in the same room, each of the witnesses was interviewed separately and at a distance from the others; such a procedure resulted in independent identification, free from the damaging influence which might have inured had the witnesses been in the presence of each other when making the identification. See *People v. Williams* (1972), 52 Ill. 2d 455, 463-64.

The fact that the subsequent photo arrays were not inherently suggestive is not disputed. We have examined them and do not believe that they in any way "suggested

defendant was the suspect." In *People v. Williams* (1975), 60 Ill. 2d 1, when considering the propriety of an array containing several photographs of the defendant, the court noted that "the use of multiple, identical or obviously similar, photographs of the same person is normally an undesirable photographic identification procedure." (60 Ill. 2d 1, 10.) Because the photos of the defendant in *Williams* were so dissimilar, the court found no evidence of suggestiveness. (60 Ill. 2d 1, 10.) Similarly, if the police here had used identical or obviously similar pictures of defendant at each interview, the possibility of suggestiveness would have been greater. In light of the great dissimilarity of those photographs, we find that the subsequent set of interviews, when considered in conjunction with the first, were not suggestive.

Although a lineup was not feasible at the time of the initial interviews, the same cannot be said of the subsequent interviews. Once the persons interviewed had identified the defendant's photograph, albeit tentatively, the possibility that they were not witnesses was substantially lessened. Accordingly, arranging for these witnesses to view a lineup would not have inconvenienced either them or the police to the extent necessary to find extenuating circumstances, and it was improper to again use the photographic identification technique. (See *People v. Holiday* (1970), 47 Ill. 2d 300, 307.) Nevertheless, the record clearly establishes that any impropriety involved did not affect the subsequent positive in-court identifications made by the Lopezes. Nor do we believe that impropriety should have resulted in the exclusion of Sandra Lawson's less certain in-court identification.

Reliability is the most important factor in determining the admissibility of identification testimony. (*Manson v. Brathwaite* (1977), 432 U.S. 98, 114, 53 L. Ed. 2d 140, 154, 97 S. Ct. 2243, 2253; *Neil v. Biggers* (1972), 409 U.S.

188, 199, 34 L. Ed. 2d 401, 411, 93 S. Ct. 375, 382; see also *People v. McTush* (1980), 81 Ill. 2d 513, 521; *People v. Manion* (1977), 67 Ill. 2d 564, 571, *cert. denied* (1978), 435 U.S. 937, 55 L. Ed. 2d 533, 98 S. Ct. 1513.) Both Jesse and Nora Lopez had an excellent opportunity to view defendant at the time for which their testimony was sought—to corroborate Quick's testimony concerning the couple's whereabouts in Wisconsin on November 2, 1979. Mr. Lopez conversed for more than 20 minutes at close range with defendant during a "slow" time at his bar, and Mrs. Lopez was present during the conversation. Both witnesses, while occupying themselves with routine tasks during the conversation, were attentive during the conversation. Indeed, their degree of attention was heightened due to defendant's and Quick's friendliness, coupled with the fact that they were strangers in a bar frequented almost exclusively by a regular clientele. Although the witnesses were not asked to supply a description of defendant, both of them positively identified the defendant's picture from an array which was not at all suggestive. Because the photograph of defendant used during the initial interviews was of such poor quality, the fact that the witnesses were less certain when identifying that photograph does not reflect adversely on the reliability of the subsequent positive photographic and in-court identifications. We accordingly conclude that the in-court identifications made by the Lopezes were clearly reliable and therefore properly admitted. *People v. McTush* (1980), 81 Ill. 2d 513.

The question asked of Sandra Lopez during trial was whether she saw anybody in the courtroom "who looks like" the man who was in the bar on November 2, 1979. She identified defendant. We consider that that testimony as well as her prior tentative photograph identification was relevant to the weight to be accorded her identification. (See *People v. Allender* (1977), 69 Ill. 2d 38, 44.) The cir-

cumstances were such as to indicate that she, too, could have made a reliable in-court identification. The fact that she did not make a positive identification did not render her testimony inadmissible.

Defendant's further argument that the trial court erred in failing to *sua sponte* instruct the jury concerning the possibility of mistaken identification is unpersuasive. He contends that the dangers inherent in eyewitness identification testimony generally, coupled with the specific risks involved in this case, made such an instruction necessary. As we have indicated, however, the identification testimony was not premised upon a "combination of suggestive photographic displays," and we therefore cannot agree that there existed specific risks in this case which made such an instruction necessary to protect defendant's right to a fair trial. Further, the trial court is ordinarily under no obligation to give instructions not requested by the parties (*People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Underwood* (1978), 72 Ill. 2d 124, 129) and under the circumstances of this case, the instructions given on the credibility of witnesses generally, the presumption of innocence, and the burden of proof adequately protected defendant's right to a fair trial. *People v. Stringer* (1972), 52 Ill. 2d 564, 569-70; *People v. Fox* (1971), 48 Ill. 2d 239, 249; see also Illinois Pattern Jury Instruction, Criminal, No. 3.15 (2d ed. 1981)—Circumstances of Identification. "The Committee recommends that no instruction be given on this subject. It should be adequately covered by the general instruction on believability of witnesses."

Defendant raises several issues concerning his representation: He argues that the trial court's denial of his pretrial motion for a change of counsel violated his constitutional rights under the sixth and fourteenth amendments, that his court-appointed attorney labored under a conflict of interest, and that his attorneys' performance denied him the

effective assistance of counsel.

The Lake County public defender, George Pease, was appointed to represent defendant on December 3, 1979, after the court determined that defendant was indigent. A private attorney, Charles Kopeny, had appeared on defendant's behalf solely for an earlier bond hearing. At the arraignment on December 3, the assistant State's Attorney advised the court that defendant was charged with aggravated kidnaping and murder and announced that the State would seek the death penalty. Defendant stated that he was 44 years old, and attorney Pease informed the court that defendant had read the charges against him and understood the possible penalties. A formal reading of the indictment was waived, and a plea of not guilty was entered on all charges.

Defendant thereafter wrote a letter to the court in which he expressed his concern about his attorney's preparation for trial. The court held a hearing on January 7, 1980, at which time defendant requested a change of venue to Cook County and asked the court to appoint an attorney from the bar. Attorney Pease advised the court that potential witnesses in Indiana had been interviewed and that the investigation was proceeding in southern Wisconsin and northern Indiana. The court denied defendant's request, indicating that it had confidence that defendant would be competently represented by the public defender's office.

Two months later, on March 7, the court held another hearing, after receiving a written motion from defendant entitled "Amended Motion For Change of Attorney"; several exhibits were attached. Defendant stated in his motion that attorney Pease and his investigator were misleading and deceiving him by ignoring phone calls and messages from defendant and his friends, and falsely stating that witnesses were being interviewed, when in fact they were

neither interviewing defense witnesses nor pursuing other avenues of investigation. Further, he asserted that attorney Pease had previously been the subject of similar charges. Attached to the motion were newspaper clippings, dated September 15, 21 and October 29, 1979, affidavits of seven individuals, and two letters. The newspaper articles indicated that attorney Pease had been under grand jury investigation stemming from charges that he had pressured his investigator to drop charges against a State representative. The newspaper account also related that the chief judge of Lake County was investigating allegations that attorney Pease had often been absent from his office and operated his office "in a fashion which could deprive clients of adequate defenses." In late October, the grand jury refused to return an indictment for obstruction of justice, although the newspaper account related that the grand jury released a report in which it stated that attorney Pease's attitude had "led to the exercise of poor judgment" in the State representative case.

The affidavits were dated January 6, 1980, the day before the prior hearing, and all the affiants stated that "no one from the Public Defender's Office has approached me regarding the information I have, which may be of help in the defense of Robert Kubat."

The letters, addressed to the trial judge, were written by John Gabriel and Francine Bejda. Mr. Gabriel, a "family member," stated that he had been unable to reach attorney Pease and the investigator for the public defender's office, Stephen Martin, on three separate occasions and that his phone calls were not returned. Further, he stated that he had supplied counsel and the investigator with the names of individuals who should have been interviewed but were not.

Francine Bejda wrote that she had attempted to reach Mr. Pease and Mr. Martin at least 10 times, and that her

phone calls were never returned. She was trying to reach them for advice on what she should do with defendant's possessions, which she thought could be helpful to defendant and could be lost or destroyed because she had to vacate the premises.

The court conducted a fairly extensive hearing on defendant's motion. Defendant stated that he thought very little was being done in his defense, although he could not supply the court with specific information or the names of individuals who had not been contacted. Defendant stated, "I don't know the names of some of the people because these people just have to prove that I was there. *** With all at stake I thought they should go all out and try to find anybody in my favor." He did indicate, however, that there were three different gas stations, one of which was in Hammond, Indiana, and other places in Gary and Hammond, Indiana, where he had directed attorney Pease to investigate. The judge asked the public defender to advise the court as to what had been done in defendant's behalf in view of his general allegations, and attorney Pease then questioned investigator Martin under oath.

The investigator testified that he had interviewed Julie Lewis, Dale Gonsky and Dorothy Hawley in Kenosha, Wisconsin, in December 1979. In January 1980, he interviewed Sandra Lawson and Rhonda Meeker in Kenosha, Michael and Delores Padgen in Berwyn, Illinois, and a potential witness, Kevin Gibson, at the Skyline motel in Gary, Indiana. In February, he interviewed Jesse Lopez and Nick Bastian in Kenosha, and Lillian Tesnohlidek and Mario Brajkovich in Chicago. Also interviewed that month by either Mr. Martin or Mr. Pease and another individual from their office were George and Tony Matos, potential witnesses, at a service station in Gary. In March, investigator Martin took several photographs at a gas station in Indiana and attempted to locate Mary Sands, whom he indi-

cated he would make a later attempt to contact. In addition, the investigator testified that he had held telephone conferences and issued a *subpoena duces tecum* for various records. He further stated that either he or the public defender had met with defendant weekly at the Lake County jail more than 14 times, and that Francine Bejda as well as various members of defendant's family had been to their office probably 10 times. "Ace" Kubat, one of defendant's brothers, had supplied the names of several persons whose knowledge was limited to Quick's possible prejudice.

Following Mr. Martin's testimony, defendant indicated that he was still not satisfied. The court, finding that there had been a substantial investigation on behalf of defendant in three States, and that there was no evidence which suggested that defendant did not have competent counsel who was actively working in his behalf, denied defendant's motion. Trial was set for March 31, 1980.

On March 20, another hearing was held, at which time attorney Pease informed the court that defendant's family and friends had contacted an Illinois attorney, Arthur O'Donnell, who requested leave to enter the case on March 31 as co-counsel. Mr. Pease also asked for a continuance of the trial date, to which defendant consented. The court indicated that it would allow attorney O'Donnell to enter the case to assist the public defender, who would be lead counsel. The court also stated that it would inquire into the circumstances under which Mr. O'Donnell was being paid to determine whether defendant, who had been adjudged indigent, would continue to receive representation from the public defender.

On March 31, Mr. O'Donnell appeared in court with defendant and Mr. Pease and entered his appearance as additional counsel. He informed the court that he was not being paid by defendant or anyone in defendant's immediate family. Later he stated that defendant's mother in

Florida was contributing. He indicated that it was not his intention to substitute for Mr. Pease because he had not had sufficient time in which to prepare. By agreement between the State and defendant, a new trial date was set for June 9.

On June 6, the hearing on defendant's motion to suppress began with both defense attorneys actively participating. On June 9, a further discussion took place concerning Mr. O'Donnell's status as co-counsel. The court initially ruled that Mr. O'Donnell could serve only in an advisory capacity in view of the appointment of the public defender. The defense attorneys pointed out that the relationship between Mr. O'Donnell and defendant had existed since approximately 1965, and Mr. Pease indicated that he had observed that defendant had a certain degree of confidence in Mr. O'Donnell. It was argued that a ruling by the court which would limit counsel's role would deny defendant the effective assistance of counsel and counsel of his choice. The State partially agreed, expressing concern that the contemplated ruling would present a viable issue on appeal in the event of a conviction. The trial judge subsequently reconsidered his ruling and advised Mr. O'Donnell that he would be permitted to participate at trial to the same degree that he had at the hearing on the motion to suppress. As a result of the court's ruling, defendant was in the anomalous but favored position of being represented by two quite competent attorneys, the private attorney of his choice employed by his mother and others and the public defender who had been appointed because of defendant's indigency.

Defendant's claim that the trial court merely conducted a perfunctory inquiry following defendant's request for a change of counsel despite, he asserts, the presentation of substantial grounds indicating that counsel was operating ineffectively and under a conflict is a plain misstatement of

the facts. The trial court conducted two hearings. At the first hearing, conducted one month following counsel's appointment, no evidence was presented which showed a factual basis underlying the allegations. At the subsequent hearing, defendant supported his allegations with affidavits, signed two months previously, two letters that added little to defendant's claims, and newspaper clippings, some of which were nearly six months old, which indicated that the grand jury had completed its investigation of Mr. Pease, prior to his appointment as defendant's attorney, and refused to return an indictment. Defendant's allegations that the public defender was not exercising diligence, pursuing avenues of investigation, interviewing witnesses or being responsive to defendant were largely refuted by Mr. Martin's testimony, which revealed that an extensive investigation had already been conducted and was continuing with defendant being visited regularly. Under these circumstances, after an evidentiary hearing established that defendant's allegations were substantially unsupported, the trial court's denial of defendant's motion for a change of counsel was not error. (*People v. Lewis* (1981), 88 Ill. 2d 129, 161.) Moreover, the fact that Mr. O'Donnell, a private attorney of defendant's choice, entered the case shortly after the hearing and more than two months before trial substantially militates against defendant's claims. Defendant's argument here that he is entitled to a new trial at which he will be represented by counsel other than the public defender completely ignores the fact that he *was* represented by another attorney in addition to the public defender. Too, we find nothing in the record which indicates that defendant's initial lack of faith in his appointed counsel resulted in an "irreconcilable conflict." (*People v. Friedman* (1980), 79 Ill. 2d 341, 349; *People v. Lewis* (1981), 88 Ill. 2d 129, 159.) Indeed, defendant's dissatisfaction seems to have dissipated once Mr. O'Donnell entered

the case as co-counsel.

Defendant makes a related claim that the trial court erred in failing to ascertain the nature and extent of his court-appointed attorney's potential conflict of interest after defendant informed the court of the facts underlying the potential conflict. He urges that a conflict of interest was apparent, making it unnecessary to demonstrate that any prejudice resulted therefrom, and that he was therefore denied the effective assistance of counsel. As we have noted, the newspaper articles, upon which defendant relies to establish that a potential conflict of interest existed, were several months old and revealed that the grand jury had concluded its investigation of Mr. Pease with a reprimand. Although the newspaper account indicated that the chief judge of the county was continuing an unrelated investigation concerning alleged misconduct by the public defender regarding the manner in which he operated his office, that article too was several months old. Moreover, the evidence at the hearing established that defense counsel was actively working on defendant's behalf whether or not there were allegations against him that he had previously been absent from his office with some frequency. Defendant argues, however, that "subtle" influences nevertheless existed which could have adversely affected counsel's ability to represent him in an independent and vigorous manner. These subtle influences existed, he asserts, because, despite the grand jury's action, the State's Attorney of Lake County had the option to continue the investigation and either reconvene the grand jury or proceed by information. Among the cases cited by defendant, all of which involved an alleged potential or actual conflict of interest in the way of conflicting professional relationships or obligations, none are sufficiently analogous to lend support to this tenuous claim. (*E.g., Cuyler v. Sullivan* (1980), 446 U.S. 335, 64 L. Ed. 2d 333, 100 S. Ct. 1708; *Holloway v.*

*Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173; *Glasser v. United States* (1942), 315 U.S. 60, 86 L. Ed. 680, 62 S. Ct. 457; *People v. Kester* (1977), 66 Ill. 2d 162; *People v. Stoval* (1968), 40 Ill. 2d 109.) Since no potential or actual conflict of interest was present in the form of counsel's professional relationships or obligations, which would have obviated the need to show actual prejudice (see, *e.g., People v. Franklin* (1979), 75 Ill. 2d 173, 176), the trial court's failure to appoint separate counsel or make a further inquiry regarding the alleged conflict did not deprive defendant of the effective assistance of counsel. See *People v. Lewis* (1981), 88 Ill. 2d 129.

Defendant further characterizes his attorney's performance as "of such a nature as to deny him the effective assistance of counsel." Considering the quality of the representation revealed by this record, it would be frivolous to argue that it approached "actual incompetence *** which result[ed] in substantial prejudice without which the outcome would probably have been different." (*People v. Carlson* (1980), 79 Ill. 2d 564, 584-85.) Defendant does not do so. Rather, he alleges that some actions of trial counsel were erroneous, or should have been done differently. We deem it unnecessary, in order to demonstrate that defendant received competent representation, to detail the actions taken by the trial attorneys on defendant's behalf, many of which are evident from our discussion of the pretrial hearings, conferences, and testimony. Suffice it to say that the record establishes that his attorneys competently and vigorously defended him and insured that he received a fair trial. Few potential errors were waived because of inaction; indeed, it is more likely that any inaction by the attorneys was a matter of strategy "as to which hindsight frequently indicates a different course might have been preferable." *People v. Lewis* (1981), 88 Ill. 2d 129, 154.

Among the instances alleged to demonstrate ineffective-

ness, defendant cites several in which an objection would have been frivolous and several in which a favorable ruling or further action by the attorneys would have been inconsequential. He complains that, prior to trial, his attorneys failed to pursue his request for a change of venue, failed to impeach Nora Lopez during the suppression hearing with a prior inconsistent statement, and failed to request a *Montgomery* (*People v. Montgomery* (1971), 47 Ill. 2d 510) hearing. Further, the attorneys failed to request an instruction at the close of the evidence on the dangers inherent in identification testimony and did not tender an instruction for the offense of unlawful restraint, a lesser included offense of aggravated kidnaping. Several other matters are raised concerning the attorneys' performance at the sentencing hearing.

The failure to pursue defendant's request for a change of venue obviously does not demonstrate incompetence on this record. We find nothing in the record, nor is any argument brought to our attention on appeal, which indicates that defendant could not or did not receive a fair trial in Lake County by a fair and impartial jury. See *People v. Torres* (1973), 54 Ill. 2d 384, 389-90.

The failure to impeach Nora Lopez during the suppression hearing with her prior written statement was inconsequential. The trial court denied the motion to suppress her in-court identification testimony because that testimony was reliable: "[S]he had ample opportunity to observe and reason to remember *** the couple ***." Moreover, Mrs. Lopez was subsequently impeached during trial with the written statement she had made in which she stated that she could not initially make a photographic identification, and the statement was admitted in evidence. Counsel was not remiss in emphasizing this fact in closing argument, and the jury was instructed that the fact that a witness had previously made an inconsistent statement was to be

considered in determining the weight to be given that testimony. The court's ruling would not have been different had Mrs. Lopez been impeached with the statement at the suppression hearing; and the failure to impeach her was not incompetence. See *People v. Johnson* (1970), 45 Ill. 2d 501, 505.

Had defendant's attorneys requested a *Montgomery* hearing to prevent the State from impeaching defendant with his numerous convictions if he testified, the motion would undoubtedly have been denied. As we stated in *People v. Lewis* (1981), 88 Ill. 2d 129, in which the identical claim was made and rejected under very similar facts, "The fact that [defendant] did not testify in the sentencing phase, even though the full record had been admitted in those proceedings, would seem to be some indication that there were reasons other than his criminal record for his failure to testify. This fact, coupled with the probability that the motion to exclude would have been denied [citations], militate against a characterization of that conduct as demonstrating incompetence." 88 Ill. 2d 129, 156.

Nor do we agree that the failure to request an instruction on the dangers inherent in identification testimony shows incompetence. That request, too, would have probably been denied, under the facts in this case, and it is apparent that defendant's attorneys placed considerable emphasis both in cross-examination and in closing arguments upon the possibility of misidentification by the non-occurrence witnesses. Counsel is not required nor should he be criticized for failing to make useless requests. *People v. Lewis* (1981), 88 Ill. 2d 129, 156; *People v. Johnson* (1970), 45 Ill. 2d 501, 505-06.

Finally, the failure to tender an instruction on the lesser included offense of unlawful restraint does not establish incompetency; such an instruction would have been inconsistent with defendant's alibi defense, and thus appears to

have been a matter of trial strategy. Defendant contends that such an instruction could have only helped him, since a finding of guilty of unlawful restraint instead of aggravated kidnapping would have precluded imposition of the death penalty. While this contention may be true in retrospect, with a guilty verdict of murder and aggravated kidnaping and a sentence of death, in the posture of the trial, tendering such an instruction would have been entirely incompatible with the proffered defense. Indeed, it might have resulted in the attorneys abdicating defendant's position to the extent of denying him effective representation. (See *People v. Redmond* (1972), 50 Ill. 2d 313, 316-17.) Incompetence is not established by erroneous or unsuccessful strategic judgments (*People v. Murphy* (1978), 72 Ill. 2d 421, 437); under the circumstances, the attorneys appear to have presented the best possible defense. *People v. Torres* (1973), 54 Ill. 2d 384, 391.

Nor can we agree that the trial judge was under an obligation to instruct the jury *sua sponte* on the offense of unlawful restraint. It is well settled that the burden of preparing jury instructions is primarily on the parties, not the trial court; and as we have indicated, with limited exceptions the trial court is under no obligation to give jury instructions not requested by counsel; (*People v. Carlson* (1980), 79 Ill. 2d 564, 583; *People v. Underwood* (1978), 72 Ill. 2d 124, 129; *People v. Grant* (1978), 71 Ill. 2d 551, 557.) This is true in capital cases as well as other criminal proceedings. (*People v. Gaines* (1981), 88 Ill. 2d 342, 366-67.) *People v. Joyner* (1972), 50 Ill. 2d 302, cited by defendant for the proposition that failure to instruct *sua sponte* on a lesser included offense may constitute plain error, is distinguishable. In that case, defendant tendered an instruction setting forth the law of voluntary manslaughter, but it was not in conformity with the appropriate IPI instruction. Since defendants there raised the defense of self-

defense to murder, the case was close factually, and the defendants tendered an instruction, although incorrect, on voluntary manslaughter, this court held that the trial court should have given an appropriate instruction. 50 Ill. 2d 302, 307.

Defendant does not dispute the fact that the evidence supported a finding of guilty of aggravated kidnaping if the defendant was found to be the abductor. (See *People v. Bishop* (1953), 1 Ill. 2d 60, 64, where the court found that a person forcibly confined in an automobile on the highways of the State "may be more secretly and effectively confined from the kidnapper's standpoint than one kept in a building or other place of incarceration.") We consider that under the circumstances here where the defendant submitted alibi evidence and did not request a lesser included instruction, and the case was not close factually, the trial judge was under no obligation to *sua sponte* instruct the jury on the lesser included offense; the failure to do so did not constitute plain error or result in an unfair trial. See *People v. Grant* (1978), 71 Ill. 2d 551, 558.

At the sentencing hearing, defendant complains that his attorneys failed to object to the admission of irrelevant and inflammatory evidence, allowed the State to present both opening and rebuttal arguments, did not offer any evidence in mitigation and failed to object to erroneous, inconsistent and fatally prejudicial instructions or to tender other instructions.

During the second phase of the sentencing hearing, Quick testified to the victim's fear, cooperation and plea that she not be hurt. She told defendant that she was 63 years old and had 13 grandchildren. During the closing arguments, the prosecutor made two references to this fact. Defendant contends that his attorneys' failure to object to this evidence and the subsequent argument which was irrelevant and highly prejudicial demonstrates

ineffective assistance and that this highly prejudicial evidence denied him due process.

Initially, we must point out that defense counsel did challenge, albeit unsuccessfully, testimony by Quick concerning any conversations with the victim unless the victim's statements qualified as dying declarations. Further, the evidence was not introduced during trial and therefore did not influence the verdict, and we believe that the victim's plea for her life and the statements she made in an attempt to convince defendant not to hurt her were relevant as additional aggravating factors to be considered by the jury. (*People v. Gaines* (1981), 88 Ill. 2d 342, 371; see also *People v. La Pointe* (1981), 88 Ill. 2d 482, 494-98.) Moreover, the prosecutor did not, as defendant contends, "repeatedly emphasize" this fact in closing argument. We do not agree that the evidence was erroneously received or the argument improper.

Defendant's contention that he was denied the effective assistance of counsel because his attorneys did not offer mitigating evidence or object to the order of presentation of closing arguments at the second phase of the sentencing hearing, although neither side has a burden of proof at that stage, is unpersuasive. As we have indicated, the record clearly does not support defendant's allegation that his attorneys rendered ineffective assistance of counsel. Nor do we find any merit in defendant's contention that his sentence must be vacated because the prosecutor was allowed to present a rebuttal argument at the second stage of the sentencing proceeding.

The failure to offer evidence in mitigation does not necessarily demonstrate incompetence. (See *People v. Gaines* (1981), 88 Ill. 2d 342, 351 ("The defendant did not take the stand at the penalty hearing, and he called no witnesses to rebut the State's evidence in aggravation or to testify to any mitigating factors"); see also *People v. Ruiz* (1982), 94 Ill. 2d 245.) If, as defendant contends, the jury had no al-

ternative but to impose the death penalty, the reason seems to be that there was nothing sufficiently mitigating in the circumstances surrounding the crime, defendant's background or otherwise, that could have been presented.

Defendant's record of violent criminality began at age 21, and the pattern continued consistently for the next quarter century. The presentence report and the FBI files contained in the record indicate that defendant was drafted into the army in December 1954 and was assigned in Georgia. He went AWOL in September 1955, in order to evade a charge of assault, and then proceeded to commit a series of separate armed robberies in Florida. He pleaded guilty and was sentenced to five consecutive five-year terms. While incarcerated defendant was something less than a model prisoner. In July 1958 he and a fellow prisoner escaped from a Florida State road camp, stole a car, and were later apprehended in Ohio. Defendant then escaped from the Ohio jail, and was apprehended a few weeks later. He received eight additional years' imprisonment in August 1958 for larceny and escape. Approximately one year later, he pleaded guilty to assault with intent to commit murder, possession of a weapon by a prisoner and attempted escape. He was sentenced to 10 additional years for the first offense and two concurrent one-year terms for the latter two offenses. He was released from the Florida State Penitentiary in July 1963, apparently following the decision in *Gideon v. Wainwright* (1963), 372 U.S. 335, 9 L. Ed. 2d 799, 83 S. Ct. 792.

In 1965, defendant again proceeded to commit a series of armed robberies, this time in Cook County. On March 17, he robbed a cashier and pharmacist at gunpoint at a drug store and as he fled fired a shot at a customer who was writing his license plate number. On March 22, he returned to the same drug store and at knife point robbed another cashier and the pharmacist's wife. On April 12, he committed yet another armed robbery at gunpoint at a

pharmacy, and finally on April 14, he committed a final armed robbery with a gun at another store. He pleaded guilty to each charge and was sentenced to four concurrent four- to seven-year terms.

Defendant was released from the Illinois State Penitentiary at Joliet in January 1970. He was arrested in June and charged with unlawful use of a weapon. He pleaded guilty, served eight months in jail, and received five years' probation. He was released in February 1971.

In September 1972, defendant and a companion committed an armed robbery at a dry cleaner in Berwyn. Defendant pleaded guilty to armed robbery and was sentenced to two concurrent terms of four years to four years and one day for the robbery and a violation of probation. He was paroled in 1976 from the Illinois State Penitentiary pursuant to a mandatory statutory release date, although the parole board panel concluded that he was not a good risk for parole. Since the order was mandatory, the board recommended very close supervision. Defendant was arrested later that year on a charge of unlawful use of a weapon but later found not to be a violater. His parole was continued.

During the second phase of the sentencing hearing, defendant's four 1965 convictions and his three convictions in the 1970's were introduced in evidence. The jury did not receive any evidence of defendant's criminal background prior to 1965. Defendant pointed out on appeal that he was honorably discharged from the army and was employed consistently following his last prison release, and that this information, which was contained in the presentence report, should have been introduced at sentencing in mitigation. As the State pointed out, however, defendant's army career was marked by his unauthorized absences, and interrupted when he committed several armed robberies. Had defendant's attorneys introduced the evidence concerning defendant's service in the army and honorable dis-

charge (he was originally given an undesirable discharge; it was later changed), the State, no doubt, would have responded by seeking to introduce the evidence contained in the presentence report concerning defendant's criminal behavior in the 1950's. The fact that defendant was employed following his last release from prison until his arrest for this murder would hardly have been viewed as demonstrating potential for rehabilitation considering defendant's habitual criminality. We consider that defendant's attorneys did not introduce the evidence to which appellate counsel refers because of the probability that the jury would then have received evidence that could only have been more damaging to defendant. We accordingly conclude that the failure to offer evidence in mitigation did not deprive defendant of the effective assistance of counsel.

One of the instructions given in the second phase of the sentencing hearing was erroneous. After the court gave several general instructions and instructed the jury on the factors which may be considered in aggravation and mitigation, the following instruction was given:

"If after your deliberations, you unanimously determine that there is no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates. If you sign that verdict form, the Court must sentence the defendant to death.

If, after your deliberations, you unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment."

The jury was further instructed:

"If after your deliberations one or more jurors conclude that the defendant should not be sentenced to death, all jurors shall sign the verdict reflecting the jury's inability to reach a unanimous verdict.

If after your deliberations you unanimously conclude

that the defendant should be sentenced to death, all jurors shall sign the verdict reflecting the jury's unanimous conclusion that the court shall sentence the defendant to death.

You will be provided with (2) two forms of verdict. When you have unanimously agreed upon your verdict you will select the form which reflects your verdict and sign it as I have stated.

The forms of verdict which you will receive read as follows. ***"

Neither defense attorney objected or tendered alternate instructions, which we find curious in view of the numerous objections made to the State's instructions at the conclusion of the trial itself. Nevertheless, we do not believe that the inconsistency resulted in any confusion. Nor do we believe that this inaction by the attorneys denied defendant the effective assistance of counsel.

While we agree that, despite the failure to object to an instruction, this court will take notice of errors which deprive a defendant of his constitutional rights, the giving of an erroneous instruction does not necessarily constitute a denial of due process of law. (*People v. Roberts* (1979), 75 Ill. 2d 1, 14-15.) This court has corrected "grave" errors in trial instructions despite the lack of an objection (*e.g., People v. Jenkins* (1977), 69 Ill. 2d 61, 66), and refused to apply the waiver rule where the case was close factually and fundamental fairness required that the jury be properly instructed (*People v. Joyner* (1972), 50 Ill. 2d 302, 307). Here, however, we find no fundamental unfairness. No mitigating evidence had been offered, presumably because there was little available, and the jury had no factual disputes to resolve. There is no indication that the jury was in any manner confused. The alternate verdict form was clear and simply drafted:

"[W]e, the jury, cannot unanimously conclude that the death penalty shall be imposed upon the defendant, ROBERT KUBAT. The Court shall sentence the defendant to imprisonment."

While we agree that the second paragraph of the first of the earlier quoted instructions was incorrect in requiring unanimity, we cannot conceive that the jurors could have believed the death sentence verdict should be returned in the absence of complete agreement.

In *People v. Lewis* (1981), 88 Ill. 2d 129, in considering whether the court erred in failing to instruct the jury that if it failed to agree that there were no mitigating factors sufficient to preclude the imposition of the death penalty, the trial judge would impose a sentence of imprisonment, we commented:

> "The jury appears to have experienced little difficulty in deciding that there were no 'mitigating factors sufficient to preclude death,' returning that verdict in approximately one hour. Too, the judge, at the request of defense counsel, had the jury polled, a process (see *People v. Kellogg* (1979), 77 Ill. 2d 524) which normally reveals any overbearing of one juror by another." (*People v. Lewis* (1981), 88 Ill. 2d 129, 150.)

Here, too, the jurors took only an hour to decide there were no sufficient mitigating factors and to return their verdict accordingly. No evidence of doubt or hesitation was apparent during the polling process.

Among the remaining alleged trial errors cited by defendant, he contends that his attorneys' waiver of his presence at the conference on jury instructions denied him his constitutional and statutory rights to be present at every stage of the proceedings. He asserts that he should have been consulted concerning the decision not to tender an instruction on the risks of misidentification, and that he was fatally prejudiced by the decision not to tender an instruction on the offense of unlawful restraint. As we have indicated, an instruction on the risks of eyewitness identification would have probably been denied, and the failure to offer a lesser included instruction was a matter of trial strategy. Considering that defendant's claim was that he was not a participant in the abduction and murder of Ly-

dia Hyde, we believe that his presence at the conference, in which his rights were adequately protected, would not have had a "relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." (*Snyder v. Massachusetts* (1934), 291 U.S. 97, 105, 78 L. Ed. 674, 678, 54 S. Ct. 330, 332; see also *People v. Pierce* (1974), 56 Ill. 2d 361, 365.) The principal case relied upon by defendant, *People v. McGrane* (1929), 336 Ill. 404, 409, in which the court instructed the jury in defendant's absence following a request by the jury for further instructions, is inapposite.

Defendant next argues that the trial court abused its discretion by admitting over defense objection five enlarged color photographs of the victim which he characterizes as gruesome and argues could only have served to inflame and prejudice the jury. Three of the photographs were taken before the autopsy. One showed a view of the victim's face, another depicted the left side of her head, and the third showed the right side of the victim's head. The remaining two photographs which were taken following the autopsy showed views of the left and right sides of the victim's head. A small area around her ear was partially shaved, and the wounds were cleaned. There appear to be brain fragments near the victim's hair. The State justifies the admission of the photographs on the ground that they depicted the nature, extent and location of the victim's wounds and were thus admitted for a proper purpose.

In *People v. Foster* (1979), 76 Ill. 2d 365, this court found no abuse of discretion in admitting four color photographs of the decedent's decaying and dismembered body which were quite gruesome because they were probative of the time and manner of the homicidal death and the circumstances of its concealment. The court extensively reviewed prior cases, in which the photographs held admissible seemed far more gruesome than those admitted here,

and noted that "photographs depicting the condition of the decedent normally are probative of one or more issues, such as manner or cause of death, means used, and location of the events in question. That such photographs potentially are prejudicial to the defendant is due largely to their accurate depiction of a horrible crime." 76 Ill. 2d 365, 378.

Defendant's argument here that the photographs were irrelevant to any issue because there was no question that a horrible crime had been committed is, under our cases, without merit. Photographs may be properly admitted to corroborate testimony on the same subject (*People v. Henenberg* (1973), 55 Ill. 2d 5, 13-14), despite defendant's offer to stipulate as to matters shown by the photographs (*People v. Nicholls* (1969), 42 Ill. 2d 91, 99, *cert. denied* (1970), 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578; *People v. Speck* (1968), 41 Ill. 2d 177, 202-04). While we might disagree with the trial court on the necessity to admit all five photographs, we cannot say, under the decisions, that that ruling was an abuse of discretion. *People v. Foster* (1979), 76 Ill. 2d 365 and cases cited therein; see also *People v. Lindgren* (1980), 79 Ill. 2d 129.

Defendant also argues that it was reversible error for the trial court to foreclose defense counsel from asking Joy Jesuit whether Quick had told her that Quick and defendant had had sex. The witness testified that Quick had stayed at her residence in November 1979, while Quick was still married to defendant. During the course of the witness' direct testimony on behalf of defendant, defense counsel established that she and Quick had had many conversations. He then asked the witness whether Quick had ever told her that Quick had had sex with defendant. She responded affirmatively. The court sustained an objection, and the jury was instructed to disregard the answer. Defense counsel subsequently asked whether Quick had complained of the marriage relationship. The witness re-

sponded that she had not. The court again sustained an objection. The State submits that the questions were improper for several reasons, but mainly because defense counsel failed to establish a proper foundation—Quick was not asked on cross-examination whether she had had such a conversation. See, *e.g., People v. Smith* (1980), 78 Ill. 298, 304-05.

The purpose of eliciting evidence of a prior inconsistent statement is to cast doubt on the testimony of a witness or to impeach his or her credibility. (*E.g., People v. Moses* (1957), 11 Ill. 2d 84, 87.) In view of the fact that Quick was extensively cross-examined on the subject of her sexual intimacy with defendant during their second marriage and impeached herself by her equivocal testimony, we consider that the admission of Joy Jesuit's testimony on this issue, even if a proper foundation had been established, would not have affected the outcome of defendant's trial considering the substantial corroboration of Quick's account of the events of November 2, 1979.

Defendant's final argument concerning the conduct of his trial is that the prosecutor's closing argument was improper. He contends that the prosecutor's remarks that Francine Bejda was a witness available to defendant but did not testify that she was with him on November 2, 1979, impermissibly shifted the burden of proof to defendant and destroyed the presumption of innocence. We do not agree.

In *People v. Nilsson* (1970), 44 Ill. 2d 244, 248, *cert. denied* (1970), 398 U.S. 954, 26 L. Ed. 2d 296, 90 S. Ct. 1881, the court noted that there was conflicting authority in Illinois on the question of whether it is improper for the prosecutor to comment on defendant's failure to support his alibi by presenting the alleged alibi witness. The court held that, in any event, the remarks do not constitute reversible error unless they result in substantial prejudice to the accused. Since that decision, this court held, in *People*

*v. Blakes* (1976), 63 Ill. 2d 354, 358-60, that it was not improper for the prosecutor to comment on defendant's failure to produce any witnesses from the club where defendant had testified he spent five hours on the night of the crime. The court quoted with approval from *People v. Williams* (1968), 40 Ill. 2d 522, 528-29, *cert. denied* (1960), 393 U.S. 1123, 22 L. Ed. 2d 129, 89 S. Ct. 1004:

> " '[A] jury in its deliberations is not limited to a consideration of that which is, strictly speaking, testimony. To the contrary, it may properly consider any facts developed in the trial from which a reasonable inference may be drawn for or against either party. For instance, if it is developed in a trial that a witness exists, presumably under the control of a defendant, who can throw light upon a vital matter, and he is not produced, certainly a jury may fairly consider that fact, and, likewise, counsel would have a legitimate right to comment thereon. \*\*\*
>
> [I]t is our conclusion that though failure to call a witness or produce evidence may not be relied on as substantial proof of the charge, nonetheless, if other evidence tends to prove the guilt of a defendant and he fails to bring in evidence within his control in explanation or refutation, his omission to do so is a circumstance entitled to some weight in the minds of the jury, and, as such, is a legitimate subject of comment by the prosecution.' " (63 Ill. 2d 354, 359-60.)

(See also *People v. Lion* (1957), 10 Ill. 2d 208; *cf. People v. Moore* (1973), 55 Ill. 2d 570.) Subsequently, in *People v. Beller* (1979), 74 Ill. 2d 514, 526, this court held that, while it was harmless error beyond a reasonable doubt, it was improper for the prosecutor to comment during closing argument on defendant's failure to call a witness because there was no showing that the witness was an alibi witness and that he was not equally accessible to both parties.

In the appellate court, in decisions too numerous to list, in interpreting the cases from this court, limited comment has been approved as an exception to the general principle (see *People v. Munday* (1917), 280 Ill. 32) that it is im-

proper to comment on defendant's failure to produce witnesses: "[I]f a defendant 'injects into a case his activities with potential witnesses during a particular period of time ostensibly for the purpose of establishing an alibi \*\*\*, his failure to produce such witnesses is a proper subject of comment on the part of the State.'" (*People v. Lawson* (1980), 86 Ill. App. 3d 376, 405, quoting *People v. Gray* (1964), 52 Ill. App. 2d 177, 190, *rev'd on other grounds* (1965), 33 Ill. 2d 160; accord, *People v. Gaines* (1982), 104 Ill. App. 3d 974, *People v. Kane* (1980), 81 Ill. App. 3d 641, 644; *People v. Jackson* (1979), 79 Ill. App. 3d 660, 667.) Some of the decisions have indicated that when alibi witnesses are injected into the case by defendant, they are deemed unavailable to the prosecution (*e.g., People v. Scott* (1980), 92 Ill. App. 3d 106, 112), while others have stated that the permissibility of the prosecutor's comments is "not limited to situations where the potential witnesses are unavailable to the prosecution" (*People v. Wilson* (1978), 66 Ill. App. 3d 330, 337).

We accordingly conclude, consistent with *Blakes* and the appellate court decisions, that where a defendant injects into the case the name of an alibi witness and then fails to call the witness, the prosecutor may legitimately comment on the lack of such evidence although it may not be relied upon as proof of the charge. We do not see why the rule should be different here because, defendant contends, the prosecutor had the power to subpoena the witness. The prosecutor's comments regarding defendant's failure to produce Francine Bejda, the alleged alibi witness, were therefore not improper.

Defendant contends that his sentence must be vacated because a prospective juror was excused in violation of the principles established in *Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770. The potential juror stated that he did not believe in the death penalty. The court then asked him whether it was his opinion "that

no matter what the facts of the case were, or no matter what the background of the defendant was, that under no circumstances would (he) ever consider signing a verdict directing the court to sentence the defendant to death?" He replied, "I don't think I could do it." The juror was excused by the court without an objection from the defense attorneys.

The fact that a potential juror prefaces his answers with phrases like, "I don't think" or "I don't know" is not necessarily to be viewed as an expression of doubt or reservation. (*People v. Gaines* (1981), 88 Ill. 2d 341, 356.) *Witherspoon* does not prescribe a set catechism or require "a venireman to express himself with meticulous preciseness." (*People v. Gaines* (1981), 88 Ill. 2d 342, 356.) We recognize, of course, that a potential juror cannot be automatically disqualified because of general opposition to the death penalty. (*Witherspoon v. Illinois* (1968), 391 U.S. 510, 20 L. Ed. 2d 776, 88 S. Ct. 1770.) As we stated in *Gaines*, however, the trial judge is in a superior position to ascertain the meaning which the venireman intends to convey. We find that the exclusion of the prospective juror here which was without objection did not constitute plain error. *Cf. People v. Szabo* (1983), 94 Ill. 2d 327.

Defendant also argues that his death sentence must be vacated because it was imposed in violation of double jeopardy principles. Essentially he contends that his murder conviction was enhanced to "capital" murder pursuant to the jury's determination that defendant had murdered Mrs. Hyde in the course of an aggravated kidnaping, and that the "failure to vacate that conviction allowed the jury to consider the conviction on the lesser offense as a further aggravating factor when it weighed the factors in aggravation and mitigation" in the second phase of the sentencing proceeding. Thus, he proposes that this constituted "pyramiding" upon the already enhanced murder conviction, a result prohibited by the constitutions and decisions of the

Supreme Court. To support this claim defendant relies on the decision in *State v. Cherry* (1979), 298 N.C. 86, 113, 257 S.E.2d 551, 568, *cert. denied* (1980), 446 U.S. 941, 64 L. Ed. 2d 796, 100 S. Ct. 2165, wherein the Supreme Court of North Carolina held that a sentencing jury in that State could not consider as an aggravating circumstance the underlying felony "when a defendant is convicted of first degree murder under the felony murder rule." In view of the fact that North Carolina's murder statute is entirely different from ours, the court's decision and rationale in *Cherry* is of limited value in resolving the issue with which we are presented. It is sufficient, we think, to point out that the statute under consideration in *Cherry* provided that a felony murder was deemed murder in the first degree for which the death penalty could be imposed. The felony, robbery with a firearm in that case, was subsequently an "automatic" aggravating circumstance at the sentencing proceeding. The problem, which was specifically noted not to be a double jeopardy one, was that, in that jurisdiction, the underlying felony became an element of the "capital" felony conviction. Ultimately, the court believed that the possibility that a defendant convicted of felony murder would be sentenced to death was disproportionately higher than a defendant convicted of premeditated murder, which was highly incongruous. (In view of the Supreme Court's decision in *Enmund v. Florida* (1982), 458 U.S. 782, 73 L. Ed. 2d 1140, 102 S. Ct. 3368, that statute may be subject to attack on other grounds as well.)

Initially, we point out that "there is only one offense of murder in Illinois; no distinction is made between capital and non-capital murder." (*People v. Brownell* (1980), 79 Ill. 2d 508, 524; Ill. Rev. Stat. 1977, ch. 38, par. 9—1.) Moreover, it is evident in this case that defendant's conviction of murder was not "enhanced" in the manner he posits so as to raise any double jeopardy problems.

Defendant was convicted of murder and aggravated kidnaping. The jury was instructed that in order to find him guilty of murder it must have found that the State had proved beyond a reasonable doubt that (1) he intended to kill or do great bodily harm to Lydia Hyde, or (2) he knew that his act would cause death or great bodily harm to Lydia Hyde, or (3) he knew that his acts created a strong probability of death or great bodily harm, or (4) he was attempting to commit or was committing the crime of aggravated kidnaping. The jury returned a general verdict finding defendant guilty of murder. Subsequently, however, in the first stage of the sentencing hearing, the jury unanimously found beyond a reasonable doubt that defendant had murdered Lydia Hyde in the course of an aggravated kidnaping *and* that Mrs. Hyde was actually murdered by defendant intentionally or with the knowledge that the acts which caused death created a strong probability of death or great bodily harm to her. Once the jury made this finding the offense of aggravated kidnaping did not become an underlying felony of "capital" murder for double jeopardy purposes as defendant suggests and should not have been vacated. Finally, we perceive no double jeopardy problem in allowing the jury to subsequently weigh the aggravating circumstances and any mitigating circumstances, a balancing process we have indicated is constitutionally sound, despite the fact that the precise weight to be given each factor is not calculated as percentages or proportions. *People v. Brownell* (1980), 79 Ill. 2d 508, 534.

Defendant raises several issues concerning the constitutionality of the death penalty statute, some of which have previously been considered by this court and need not be reexamined here. The statute does not offend the eighth amendment because the prosecutorial discretion (*People ex rel. Carey v. Cousins* (1979), 77 Ill. 2d 531, *cert. denied* (1980), 445 U.S. 953, 63 L. Ed. 2d 788, 100 S. Ct. 1603), and the fact that a formal presentence report is not pre-

sented to the jury does not render the death sentence invalid (*People v. Gaines* (1981), 88 Ill. 2d 342, 372-74). Defendant's further argument that the statute violates the Illinois Constitution because it allows the sentencing body to impose death without requiring a finding that the defendant cannot be restored to useful citizenship was also considered in *People v. Gaines* (1981), 88 Ill. 2d 342. We there stated that "the legislature might reasonably have concluded that the rehabilitative potential of the offender was not a relevant factor and that the jury need not consider it." (88 Ill. 2d 342, 382.) We further indicated that even if a contrary assumption were made, the Act requires that the jury consider "any mitigating factors which are relevant to the imposition of the death penalty" (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(c)), including factors other than those specified in the Act. We consider that, as in *Gaines*, there was no prejudicial error here where defendant did not introduce evidence at the sentencing hearing, tendered no instruction directing the jury to consider whether he could be restored to useful citizenship, and his counsel did not argue to the jury the possibility that defendant could be rehabilitated. (Although counsel did mention generally the "concept" of rehabilitation, no argument was made concerning defendant's rehabilitative potential.)

Defendant also urges that the death sentencing "scheme" is defective because it fails to provide adequate comparative review procedures to insure that the penalty is not imposed in an arbitrary or disproportionate manner. He contends that this court must, by rule, provide for the collection of data on all murder cases in the State, so as to make a comparison between those cases in which the death penalty is imposed and those in which it is rejected by the sentencing body, in order to guarantee that the penalty is not being imposed in an arbitrary and capricious manner. (He has attached an appendix listing several cases in which

the sentencing body rejected the death penalty and several in which the prosecutor did not request a death penalty hearing.)

In *People v. Brownell* (1980), 79 Ill. 2d 508, this court considered a similar argument. The defendant there urged that the statute does not provide for adequate review because it does not require this court to compare all the cases in which the death sentence is imposed to determine if it is being imposed uniformly. The court considered the controlling Supreme Court decisions, the automatic appellate review procedures authorized under our statute, and the rules promulgated by this court and concluded:

> "The court stated in *Proffitt*: 'While it may be true that [the Florida Supreme Court] has not chosen to formulate a rigid objective test as its standard of review for all cases, it does not follow that the appellate review process is ineffective or arbitrary.' (428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969.) The same was held as to the Texas statute. In *Jurek* it was concluded: 'By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law.' (428 U.S. 262, 276, 49 L. Ed. 2d 929, 941, 96 S. Ct. 2950, 2958.) The same may be said of the review which will be accorded each similar case before this court. The entire record undergoes scrutiny for errors and defects. The sentencing hearing is reviewed with the object of ascertaining whether any aggravating factors are proved beyond a reasonable doubt. *** Our review of the entire record also considers whether there are no mitigating factors sufficient to preclude the imposition of the death sentence. There is no indication whatsoever that, in this case or any other, our scrutiny of the record and of the propriety and proportionality of the sentence imposed will not be as vigorous and as observant of constitutional principles as it is required to be." (79 Ill. 2d 508, 543-44.)

We accordingly conclude that our appellate review procedures insure that the death penalty is not being imposed

arbitrarily or capriciously. It would unnecessarily extend an already lengthy opinion to detail the distinguishing facts in other death penalty cases reviewed and reversed by us. We deem it sufficient to state that they bear no resemblance to the circumstances here.

Nor do we believe that the statute violates the eighth amendment or due process considerations because it allows the jury in the second phase to consider undefined nonstatutory aggravating factors, does not require the State to prove beyond a reasonable doubt the absence of mitigating factors, and does not require the jury to make specific written findings as to which factors it relied upon. For the reasons stated in *Brownell* and reaffirmed in *Gaines*, the fact that the jury is not required to make specific findings in the second stage of the proceedings does not preclude our meaningful appellate review. The statute requires the State to prove beyond a reasonable doubt, in compliance with the rules governing the admission of evidence at criminal trials, the existence of certain designated aggravating factors (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(b).) "Aggravating factors serve as necessary prerequisites without which the death sentence cannot be imposed; they delineate the borderline between those cases in which death is a possible punishment and those in which it cannot be considered." (*People v. Lewis* (1981), 88 Ill. 2d 129, 145.) It is only after the jury unanimously finds beyond a reasonable doubt that specific statutory aggravating factors exist that it considers "any aggravating and any mitigating factors which are relevant to the imposition of the death penalty." (Ill. Rev. Stat. 1977, ch. 38, par. 9—1(c).) "[S]ince the sentencing authority is given specific evidence to weigh, based upon the particularized circumstances of the case, any 'discretion to be exercised is controlled by clear and objective standards so as to produce non-discriminatory application.' " *People v. Brownell* (1980), 79 Ill. 2d 508, 534, quoting *Gregg v. Georgia* (1976), 428 U.S. 153, 198, 49 L. Ed.

2d 859, 888, 96 S. Ct. 2909, 2936. " '[T]he requirements of *Furman* are satisfied when the sentencing authority's discretion is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition.' " *People v. Brownell* (1980), 79 Ill. 2d 508, 534, quoting *Proffitt v. Florida* (1976), 428 U.S. 242, 258, 49 L. Ed. 2d 913, 926, 96 S. Ct. 2960, 2969.

For the reasons stated, we affirm the judgment of the circuit court of Lake County. It is ordered that the death sentence be executed on Thursday, May 12, 1983. A certified copy of this order shall be furnished by the clerk of this court to the Director of Corrections and to the wardens of the Illinois State Penitentiary at Menard and Joliet.

*Judgment affirmed.*

JUSTICE CLARK concurring in part and dissenting in part:

I agree with Justice Goldenhersh's dissent with the exception of his suggestion that the conviction should be reversed. I believe that if the questionable identifications are excluded there remains more than sufficient evidence to sustain the conviction. However, the cause should be remanded for resentencing. I cannot agree to affirm the execution of a man in a case where the sentencing jury received erroneous, inconsistent and contradictory instructions on the procedure for determining whether the death penalty should be imposed. It is inconceivable to me that this court can allow this defendant to be put to death when the jury was improperly instructed. The death sentence should be vacated.

The jury was instructed:

"If, after your deliberations you *unanimously* conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should

sign the form which so indicates. If you sign the verdict form, the court will sentence the defendant to imprisonment." (Emphasis added.)

That instruction reflects the antithesis of the proper instruction that if just one juror concludes that the defendant should not be sentenced to death, a verdict is signed that indicates an inability to reach a unanimous verdict. While the proper instruction was given to the jury along with the incorrect instruction, for the majority to conclude "we do not believe that the inconsistency resulted in any confusion" (94 Ill. 2d at 492) is reaching a judgment that we are incapable of making. None of us sat in that jury room. We are simply not in a position to say that the erroneous instruction did not create confusion in the minds of the jurors.

And yet the majority determines that despite a clearly erroneous instruction the jurors understood their task. To reach that conclusion is patently wrong.

In *People v. Jenkins* (1977), 69 Ill. 2d 61, a jury was given two inconsistent instructions. While the defendant's counsel in *Jenkins* did not object to conflicting instructions, the court found that the failure to object did not constitute waiver because the conflicting instructions amounted to a substantial deficit that rose to the level of plain error. So, too, the failure to object in the instant case did not constitute waiver. See also *People v. Jones* (1982), 94 Ill. 2d 275, 294-95; *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77; *People v. Brownell* (1980), 79 Ill. 2d 508, 542.

The court in *Jenkins* said:

"[W]here the instructions are contradictory, the jury cannot perform its constitutional function ***. While it is true that an instruction may be inaccurate and other instructions may remove this error, such cannot be so when the instructions are in direct conflict with one another, one stating the law correctly and the other erroneously. ***

Where the instructions are contradictory, the jury is put in the position of having to select the proper instruc-

tion—a function exclusively that of the court." (*People v. Jenkins* (1977), 69 Ill. 2d 61, 66-67.)

The court concluded there that, "[c]ertainly, a person should not stand to lose his liberty because a jury has received equivocal instructions. *Bollenbach v. United States* (1946), 326 U.S. 607, 613, 90 L. Ed. 350, 355, 66 S. Ct. 402, 405." 69 Ill. 2d 61, 67.

The majority of this court attempts to distinguish the above language in *Jenkins* by deciding that case was close factually and fundamental fairness required that the jury be properly instructed. How could this court now know that at least one juror may not have changed his vote and voted against the death penalty if properly instructed? I do not believe we can say under these circumstances that in *Jenkins* the case was so close factually that we can refuse to apply the waiver rule, but this case is not close factually and we therefore could find no fundamental unfairness and affirm the imposition of the death penalty.

I also share Justice Goldenhersh's concern with the photographic-identification procedures used prior to defendant's trial on November 26, 1979, when Nora Lopez, Jesse Lopez and Sandra Lawson were shown a photographic display that included the defendant. Four of the photographs were close-ups of individuals against a wall. The photograph of the defendant was a full frontal view against a background consisting of a television set, a painting and furniture. The defendant was also the only individual wearing eyeglasses.

The majority relies upon *People v. Williams* (1975), 60 Ill. 2d 1, 9-10, in stating that the different pose of the defendant is not dispositive on the issue of suggestiveness. In *Williams*, three of eight photographs were of the defendant, one of which showed him wearing a hat and sunglasses. The court said in *Williams*: "[T]he three photographs of this defendant were so dissimilar that it is not readily apparent that they are photographs of the same man. If Mrs. Calderone's identification was weak and

based primarily on the hat and sunglasses, she might well have picked out only the photograph showing defendant in a hat and sunglasses, without recognizing that he was also the man in two of the other photographs." 60 Ill. 2d 1, 10.

Here the display included only one photograph of the defendant, which was different both in composition and background from the others, and I feel that we should not condone such a highly suggestive technique.

JUSTICE GOLDENHERSH, dissenting:

I dissent and would reverse the judgment and remand for a new trial. As Justice Clark clearly points out, the death sentence in this case should not stand. I share his views regarding the impropriety of the photographic identification and the erroneous instructions. But I cannot agree that the conviction should stand.

The majority concedes that the identification procedure was improper and that there was no reason why a lineup was not used in the later identification. The reliability of the identification should be appraised in light of the fact that the witnesses were shown the photographs more than three weeks after the day on which they had allegedly seen defendant. The record shows that three identification witnesses were permitted to view the photographs in the same room at the same time. This court has recognized that an identification by one witness may influence the identification by others. (*People v. Williams* (1972), 52 Ill. 2d 455.) Detective Myhre testified that of the five photographs shown the witnesses the picture of defendant was "distinctively different than the remaining four." Several of the witnesses were not certain of their initial identification. Mrs. Lopez particularly appears to have expressed considerable doubt as to her ability to make the identification. Nevertheless, the majority holds that the identifications were reliable.

Stripped of these questionable identifications, the conviction rests on the testimony of defendant's former wife

who was in the process of seeking an annulment of their marriage. Further, she had sent him a message in effect threatening his life, was unquestionably disgruntled with his sleeping arrangements with Francine Bejda, and was herself intermittently living with a man whose general description matched that of defendant. On this record I cannot join the majority's conclusion that the evidence "leaves no doubt of defendant's guilt of those offenses." 94 Ill. 2d at 446.

I do not agree with the majority that the circuit court did not err in failing to instruct on unlawful restraint. Section 10—1 of the Criminal Code of 1961 provides:

"Sec. 10—1. Kidnaping.
(a) Kidnaping occurs when a person knowingly:
(1) And secretly confines another against his will, or
(2) By force or threat of imminent force carries another from one place to another with intent secretly to confine him against his will, or ***." (Ill. Rev. Stat. 1979, ch. 38, pars. 10—1(1), (2).)

Section 10—3 provides:

"Sec. 10—3. Unlawful Restraint.
(a) A person commits the offense of unlawful restraint when he knowingly without legal authority detains another." (Ill. Rev. Stat. 1979, ch. 38, par. 10—3(a).)

There was no evidence here of any intent to "secretly confine [the victim] against her will," and on this record the circuit court should have given an instruction on unlawful restraint.

Simply stated, it is the majority's position that defendant was not entitled to the instruction because he did not request that one be given. It is difficult to reconcile this holding with the majority opinion in *Schutzenhofer v. Granite City Steel Co.* (1982), 93 Ill. 2d 208, in which the majority granted the defendant a new trial although the record showed that the defendant in its post-trial motion and on appeal expressly disclaimed any desire for a new

trial and repeatedly asserted that the only relief sought was entry of judgment notwithstanding the verdict.

Assuming, *arguendo*, that the trial errors may be euphemistically characterized as "harmless" the death sentence should nevertheless be vacated. The aggravating factor which invoked the death penalty provision in this case was the alleged aggravated kidnaping of the victim. Section 9—1(b)(6) provides that a defendant may be sentenced to death if the murdered individual was killed in the course of the commission of another felony if "(c) the other felony was one of the following: armed robbery, robbery, rape, deviate sexual assault, aggravated kidnapping, forcible detention, arson, burglary, or the taking of indecent liberties with a child; ***." (Ill. Rev. Stat. 1979, ch. 38, par. 9—1(b)(6)(c).) I will not lengthen this dissent by a discussion of whether that provision is constitutional, other than to point out that article I, section 11, of the Constitution of 1970 provides that "All penalties shall be determined *** according to the *** offense" and to suggest that the holding in *People v. Wagner* (1982), 89 Ill. 2d 308, casts considerable doubt on its validity. Armed robbery (section 18—2) is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 18—2(b)); robbery (section 18—1) is a Class 2 felony (Ill. Rev. Stat. 1979, ch. 38, par. 18—1(b)); rape (section 11—1) is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 11—1(c)); deviate sexual assault (section 11—3) is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 11—3(b)); aggravated kidnaping (section 10—2) for ransom is a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(b)(1); not for ransom is a Class 1 felony (Ill. Rev. Stat. 1979, ch. 38, par. 10—2(b)(2)); forcible detention (section 10—4) is a Class 2 felony (Ill. Rev. Stat. 1979, ch. 38, par. 10—4(b)); arson (section 20—1) is a Class 2 felony (Ill. Rev. Stat. 1979, ch. 38, par. 20—1(c)); burglary (section 19—1) is a Class 2 felony (Ill. Rev. Stat. 1979, ch. 38, par. 19—1(b)); taking of indecent liberties with a child (section 11—4) is a Class 1 felony (Ill.

Rev. Stat. 1979, ch. 38, par. 11—4(e)). Aggravated arson (section 20—1.1), a Class X felony (Ill. Rev. Stat. 1979, ch. 38, par. 20—1.1(b)), is not enumerated among the offenses the commission of which invokes the death penalty. It seems strange, indeed, that the General Assembly could have intended that Class 1 offenses invoke the death penalty and Class X offenses fail to do so.

The offense of aggravated kidnaping is charged in two counts in the indictment. In one count it is charged that defendant "knowingly and secretly confined Lydia C. Hyde against her will and committed great bodily harm upon her by shooting her in the head with a hand gun, thereby causing the death of Lydia C. Hyde, in violation of Section 10—2a3 of Chapter 38 of the Illinois Revised Statutes; ***." In another count it is charged that defendant committed the offense of aggravated kidnaping in that he "knowingly and secretly confined Lydia C. Hyde against her will, while armed with a dangerous weapon, a pistol, in violation of Section 10—2a5 of Chapter 38 of Illinois Revised Statutes; ***."

The jury verdict finding defendant guilty of aggravated kidnaping did not specify the count on which the finding was made. In *Williams v. North Carolina* (1942), 317 U.S. 287, 87 L. Ed. 279, 63 S. Ct. 207, the Supreme Court set aside a conviction of bigamous cohabitation which could have rested on either of two theories. The court reasoned that because a finding of guilt on one of the theories would serve to deprive the defendants of a constitutional right, it was necessary to reverse the conviction because it was impossible to determine on which theory the convictions were based. The situation presented here is clearly distinguishable from those in which a general verdict is returned covering two separate and distinct offenses. (See *People v. Jones* (1975), 60 Ill. 2d 300.) Had the question of guilt of the aggravated-kidnaping charge been submitted to the jury in separate verdicts, an acquittal on one count and a

hung jury on the other would not have served to bar a second prosecution. (*People v. Cole* (1982), 91 Ill. 2d 172.) The aggravated kidnaping was a single offense involving a single victim, and the jury had a choice of determining whether it was committed in one or both of the manners charged.

A proper verdict in the aggravated-kidnaping charge was crucial to the question whether the death penalty could be imposed. The only basis for invoking the death penalty provision in this case is, of course, the alleged commission of an aggravated kidnaping. If enhancement of the kidnaping to the offense of aggravated kidnaping rested upon the murder of the victim, then the murder served to enhance the felony from one that would not invoke the death penalty to one that, under the provisions of section 9—1(b)(6), invoked the death penalty; it then served to enhance the murder from one for which the death penalty could not be imposed to one for which it could be imposed. This is violative of the policy of lenity which applies with respect to the interpretation of criminal statutes (*People v. Haron* (1981), 85 Ill. 2d 261, 278) and contravenes the legislative intent that the felony enumerated in section 9—1(b)(6) be complete without enhancement effected by the homicide. If the review of convictions for bigamous cohabitation in *Williams* was of sufficient importance to require a clear indication of the basis of the jury's verdict, it is obviously of far greater importance in a case where the finding makes the difference between a prison sentence and a death penalty.

In the instructions in the second phase of the sentencing hearing the court instructed the jury as follows:

> "If after your deliberations, you unanimously determine that there is no sufficiently mitigating factor or factors to preclude the imposition of the death sentence on the defendant, you should sign the verdict form which so indicates. If you sign that verdict form, the Court must sentence the defendant to death.

> If, after your deliberations, you unanimously conclude that there is a sufficiently mitigating factor or factors to preclude imposition of the death sentence, you should sign the form which so indicates. If you sign that verdict form, the Court will sentence the defendant to imprisonment."

The majority concedes that the giving of the instruction was error but concludes that "we cannot conceive that the jurors could have believed the death sentence verdict should be returned in the absence of complete agreement." (94 Ill. 2d at 493.) This court has said on many occasions that jurors are presumed to have followed the instructions, and there is no basis for applying any other rule in this case. The instruction was clearly erroneous and highly prejudicial and unquestionably was a material factor in producing the verdict upon which the death penalty was based.

JUSTICE SIMON joins in this dissent.

JUSTICE SIMON, also dissenting:

I join in the dissent of Justice Goldenhersh. I also concur with Justice Clark's well-reasoned dissatisfaction with the faulty instruction and the photographic-identification procedures. For the reasons so logically and convincingly advanced by Justice Goldenhersh, my view is that the conviction cannot stand. It should be reversed, and the defendant should receive a new trial.